[No. 7,195.—In Bank.]

## A. O. MULLIGAN v. A. G. SMITH.

OPENING OF MONTGOMERY AVENUE—STREET IMPROVEMENT—PETITION—CONSTRUCTION OF STATUTE—JURISDICTION OF BOARD OF PUBLIC WORKS. Under the Montgomery Avenue Act of April 1st, 1872 (Statutes 1871–2, p. 911), the petition to the Mayor of the majority of the owners in frontage of the property to be charged with the costs of improvement (required by section 5) was necessary to set the machinery of the statute in motion, and until such a petition was filed, the Board of Public Works had no authority to organize or to proceed.

ID.—ID.—ID.—ID.—SIGNATURE OF PETITION—CERTIFICATE OF MAYOR—ESTOPPEL.—In an action of ejectment, the plaintiff deraigned title under a tax deed executed upon a sale of the premises for the non-payment of a Montgomery Avenue assessment, and the facts were as stated in the opinions of the Court.

*Held,* that the petition required by the act was not signed by the owners of a majority in frontage of the property to be charged with the costs of the improvement; that the certificate of the Mayor (under section 5 of the act) that the petition was sufficient, was not conclusive as an adjudication of the fact; that the judgment of the County Court, in confirming the report of the Board of Public Works—in the absence of any provision for notice to the parties interested—was not conclusive upon them as to the sufficiency of the petition; that the failure of the defendant to resort to legal remedies against the proceeding while *in fieri*, did not constitute an equitable estoppel; and finally, that the assessment and all the proceedings were void.

APPEAL from an order denying the plaintiff's motion for a new trial in the Superior Court of San Francisco. SULLIVAN, J.

*A. L. Rhodes* and *W. T. Wallace,* for Appellant.

The bonds are regarded in law as negotiable instruments. (*Murray* v. *Lardner,* 2 Wall. 110; *County of Warren* v. *Marcy,* 97 U. S. 107; *Orleans* v. *Platt,* 99 id. 676; *County of*

*Cass* v. *Gillett,* 100 id. 593; *Roberts* v. *Bolles,* 101 id. 119; *Pompton* v. *Cooper Union,* id. 204.)

The purchasers, when they took the bonds, had the right to assume, from the fact that they were issued, that the conditions upon which they were authorized to be issued, had been complied with. (*Commissioners of Knox* v. *Aspin-wall,* 21 How. 539.) The authorities issuing the bonds were estopped by the recital in the bonds. (*Rogers* v. *Burlington,* 3 Wall. 667.)

The assessments since 1872 having been annually collected and paid in satisfaction of the coupons attached to the bonds, the authorities issuing the bonds, and collecting and appropriating the assessments, are estopped to deny the legality of the bonds. (*Meyer* v. *City of Muscatine,* 1 Wall. 392.) On the same principles, and for similar reasons, the owners of the lots are also estopped to allege the illegality of the bonds. (*County of Ray* v. *Vansyckle,* 96 U. S. 687.)

Where conditions precedent are required to be performed, before bonds may be issued, some tribunal, board, or officer is, by necessary intendment of law, vested with authority to determine, before the bonds issue, whether the conditions have, in fact, been performed.

The only matter in the proceedings which is claimed by the defendant's counsel to be defective, relates to the petition to the Mayor, and the alleged want of notice to persons to be affected by the assessment. We will first notice the petition; and if the Court has erred in the admission of evidence in respect to it, or if the finding in regard to it is contrary to the evidence, there must be a new trial of the action.

The doctrine of the cases hereinafter cited, and of many others, which might be added, is that, in proceedings of the character of those in question, some officer, board, or tribunal has, by necessary implication, the authority to determine, before the bonds issue, whether the acts required by the statute to be performed—the conditions precedent—were in fact performed according to the statute. It may not be necessary for us to show, with entire certainty, whether this function devolved upon the Mayor, the Board of Public Works, or the County Court. But it of necessity devolved upon one of them. Third persons having been brought into relation with

the proceedings, could in no other manner have adequate protection. It would be absurd to presume that the Legislature intended that the right of the bondholder to receive the money upon a coupon, should depend upon his ability to prove, perhaps twenty-five years after the issue of the bond, that the names, or a particular name upon the petition, was a genuine signature. On the contrary, it was intended that the questions arising on the petition should be definitely determined, once for all. In no other way could the purchasers of the bonds receive adequate protection. They purchased the bonds in the belief that all the prior proceedings had been determined to be regular and legal. Upon the opposite theory, it would have been impossible to find purchasers for the bonds.

The alleged defect in the proceedings in *Commissioners of Knox* v. *Aspinwall, supra,* was that the requisite notices of the election had not been given by the Sheriff. The Court ask: Is the question whether the election was properly held, and a majority of the votes cast for the subscription, "to be determined by the Court, in this collateral way, in every suit upon the bond, or the coupon attached, or by the Board of Commissioners as a duty imposed upon it before making the subscription?" and the answer given is, that "the Court is of opinion that the question belonged to the Board;" and it further said, that "the ascertainment of the fact was necessarily left to the inquiry and judgment of the Board itself, as no other tribunal was provided for the purpose. The act mentioned in that case did not expressly empower the Board to determine that fact. (*Muncie County* v. *Hackett,* 1 Wall. 92; *County of Ray* v. *Vansyckle,* 96 U. S. 687; *Orleans* v. *Platt,* 99 id. 681.)

These authorities clearly establish the proposition that some tribunal, board, or officer must of necessity, though not expressly authorized, determine finally, and beyond the reach of a collateral attack, that the conditions precedent to the issue of the bonds, have been duly performed.

It would not be difficult to maintain the position, that to the Mayor pertained the duty of determining whether the petition conformed to the provisions of the Act.

If, for any reason, it be considered that that duty per-

tained to the Board, then their organization, action, and report are to be taken as a conclusive determination of the question of the sufficiency of the petition.

The judgment of the County Court, in approving and confirming the report, is final and conclusive of all the matters submitted to it, or upon which it was authorized by the Act, expressly or by necessary intendment, to act; and if the sufficiency of the petition was one of such matters, the judgment of the Court was also conclusive in that matter as well.

The determination, therefore, whether made by the Mayor, the Board, or the Court, was, within the principle of the above cited cases, final and conclusive, unless it be found that proper notice had not been given of the proceedings.

The Legislature may prescribe the kind of notice to be given to those who were to be affected by these proceedings, and the mode in which it shall be given. In this respect, the assessments are governed by the same rules as taxation. (Cool. on Tax. 429, 265.)

These bonds having been put upon the market, as commercial paper, the rights of the parties thereto and of those affected thereby, are to be determined by the laws as they were then construed by this Court; and the Court is forbidden, by well-recognized rules of law, to change its decisions, in such manner as to impair the validity of the bonds.

Since the issue of these bonds this Court has rendered a decision which is in full accord with the above proposition respecting assessments; and in that case every point now made by those seeking to overthrow the assessment or the bonds, was as fully involved as in this case; and the decision upheld the assessment. (*Doyle* v. *Austin,* 47 Cal. 353, decided in 1874.) Some of the cases upon which we rely, in support of our proposition, are: *Douglass* v. *Pike Co.,* 101 U. S. 677; *Rowan* v. *Runnels,* 5 How. 134; *Thompson* v. *Lee County,* 3 Wall. 331; *Ohio L. Ins. Co.* v. *Debolt,* 16 How. 416; *State Bank of Ohio* v. *Knoop,* 16 Id. 369; *Supervisors* v. *United States,* 18 Wall. 71; *Fairfield* v. *County of Gallatin,* 100 U. S. 47; *Gelpcke* v. *Dubuque,* 1 Wall. 175; *Mitchell* v. *Burlington,* 4 id. 274; *Havemeyer* v. *Iowa Co.,* 3 id. 302; *Soc. of Savings* v. *New London,* 29 Conn. 174.

If it be conceded that the doctrines of *People* v. *Lynch*, 51 Cal. 15, are not to be limited to the exigencies of that case, but are applicable to questions respecting the power of the legislature within municipalities, we contend that they can not be applied so as to overrule the decision in *Doyle* v. *Austin*, 47 id. 353, or in any manner impair the obligation or validity of the bonds, they having been issued in 1872 and 1873, and ever since that time dealt in as commercial paper. We repeat: *Doyle* v. *Austin* upheld the assessment, and the sole purpose of the assessment was to pay the coupons attached to these bonds. The adjudication that the assessment was valid, was a determination, also, that the bonds were valid and legal.

*J. H. Brewer, J. B. Crockett, Delos Lake,* and *Nathaniel Bennett,* also for Appellant.

*Garber, Thornton & Bishop,* and *J. P. Hoge,* for Respondent.

The act under which the assessment is laid is unconstitutional, because it is a clear attempt on the part of the legislature to exercise the power of assessment directly within the limits of the municipality.

The commissioners were acting as the agents of the state, and not as municipal officers in any sense. (*People* v. *Lynch*, 51 Cal. 35, and cases there cited; *Horton* v. *Town of Thompson*, 71 N. Y. 524; *Sheboygan County* v. *Parker*, 3 Wall. 93; *Taylor* v. *Palmer*, 31 Cal. 252.)

The owners were entitled to notice; without notice there was not due process of law. The only notice was by publication of a notice, that any one aggrieved might apply to the county court, not for a full hearing, but merely to object to the filing of the report.

The property owners are not estopped by the issuance of the bonds, or by the recitals therein, from showing that the conditions precedent to their issuance had not been performed, and that, therefore, they were issued without authority.

Several decisions of the Supreme Court of the United States have been cited by appellant in support of the proposition that, from the issuance of the bonds and the recital contained in them, the purchasers were entitled to presume that all

conditions precedent had been performed, and that this presumption is conclusive upon the property owner.

But those cases differ from the one at bar in many important particulars. The bonds there considered were issued by and under the seal of the corporation against which it was sought to enforce them. Its faith, credit, and property were pledged for their payment. The recitals and representations as to their validity, and the acts and conduct which were held to constitute an estoppel, were made and performed by the body exercising the general powers of the corporation.

But in the case at bar, it is the individual property owner, and not the corporate body, who is the party defendant, and against whom the estoppel is invoked. These bonds were issued by a body proceeding *in invitum* as to him; they contain no promise by him, and no pledge of his property, faith, or credit; no recitals, statements, or representations are made by him; but such as are made or are to be deduced, are entirely by this Board, who are neither his agents, nor, as to this matter, the agents of any municipal corporation of which he is a member, but derive their entire authority from the State.

In *Lynde* v. *The County*, 16 Wall. 6, the primary question was as to whether the bonds were authorized to be issued. The majority of the Court held that they were, and all other expressions in the opinion are mere *obiter*.

In this case, Mr. Justice Field (with whose views the Chief Justice and Miller, J., concurred) dissented, holding that there was no authority to issue the bonds without previous authority conferred by a vote of the people; that as the bonds were issued without the authorization of a vote of the people, the county was not estopped to deny their validity by reason of any recitals they contain; that the County Judge was only an agent of the county, acting under a special and limited authority, and he could not enlarge that authority by any representation that he possessed what was never conferred. " The statutes of the State never intended to make the liabilities of its counties dependent upon the mere statements of any of its officers. The law of agency is not different when applied to the acts of agents of municipal bodies, in a matter so serious and delicate as the contracting of a public debt,

and when applied to the acts of agents of private individuals. They must both keep strictly within the limits of their power of attorney, or their acts will be invalid. They can not cure any inherent defect in their action arising from want of power by any extent of recitals that they had the requisite authority. With great deference to the opinions of my associates, this seems to me to be a legal truism."

In *Town of Coloma* v. *Eaves*, 92 U. S. 485, Justices Miller, Davis, and Field dissented from the decision on every point, and Mr. Justice Bradley dissented on the point that the mere execution of a bond by officers charged with the duty of ascertaining whether a condition precedent has been performed is conclusive evidence of its performance. He says that a mere execution and issue of the bonds, without a recital by the officer designated to ascertain it, and who also is the proper officer to execute the bonds, that the condition precedent has been performed, is not conclusive. "It may," he says, "be *prima facie* evidence, but the contrary may be shown; and I do not think that the contrary has ever been decided by this Court." Clearly the bonds in the case at bar contain no such recital as is deemed necessary by Mr. Justice Bradley, in order to constitute an estoppel.

Again, in *Humboldt Township* v. *Long*, 92 U. S. 646, the dissenting opinion of Justice Miller (with whom concurred Justices Davis and Field) strongly combats the views of the majority, and elaborately reasons the question, and among other things, says: "But in favor of a purchaser of municipal bonds, all this is to be disregarded, and a debt contracted without authority and in violation of express statute, is to be collected out of the property of the helpless man who owns any in that district. I say helpless advisedly, because they are not his agents. They are the officers of the law, appointed or elected without his consent, acting contrary, perhaps, to his wishes. Surely if the acts of any class of officers should be valid only when done in conformity with law, it is those who manage the affairs of towns, counties, and villages, in creating debts which not they, but the property owners must pay. * * * It is easy to say, and looks plausible when said, that if municipal corporations put bonds on the market, they must pay them when they become due. But it

is another thing to say, that when an officer created by the law exceeds the authority which that law confers upon him, and in open violation of law issues these bonds, the owner of property lying within the corporation must pay them, though he had no power whatever in their issue and no power to prevent it."

This dissent and division of opinion in the Supreme Court of the United States runs through all the cases where these questions have arisen upon the facts; and it seems to us that upon reason, principle, and authority the doctrine of the dissenters is the better opinion. It finds its support in the general principles of the law of agency and the great weight of authority in the State Courts; while the contrary opinion may be said to be peculiar to the bench from which it emanated, and wholly irreconcilable with fundamental principles, which, as said by Mr. Justice Field, are "legal truisms."

The decision in *Doyle* v. *Austin*, 47 Cal. 353, does not preclude this Court from determining that the Montgomery Avenue Act is unconstitutional, if it should now be of opinion that it is so.

The leading case in support of the contrary view is *Gelpcke* v. *Dubuque*, 1 Wall. 175. It was decided in that case that the Supreme Court of the United States is not bound by the decision of the highest tribunal of a State against the constitutional validity of a State statute, where the same Court had previously decided in favor of the validity of such statute, and bonds had been issued under it and negotiated prior to the later decision.

This doctrine is peculiar to that Court, and is applicable only to its own rule of decision. No decision of any State Court has been cited, and we have found none holding that the State Court is estopped by its previous decision from declaring a statute unconstitutional; and the doctrine of *Gelpcke* v. *Dubuque* is most forcibly combated and, as we submit, shown to be unsound by Mr. Justice Miller, in his dissenting opinion in that case. (See pp. 297 *et seq.*)

After stating the general rule as to the binding force of the decisions of the highest Courts of the States, in the construction of their own constitution and statutes, and the exception contended for where such decisions have been conflicting, on

the ground that contract rights have intervened, the learned Justice continued:

"The only special charge which this Court has over *contracts* beyond any other Court, is to declare judicially whether the statute of a State impairs their obligation. No such question arises here, for the plaintiff claims under and by virtue of the statute which is here the subject of discussion. Neither is there any question of the obligation of contracts, or the right to enforce them. The question goes behind that. We are called upon, not to construe a contract, nor to determine how one shall be enforced, but to decide *whether there ever was a contract made in the case.* To assume that there was a contract, which contract is about to be violated by the decisions of the State Court of Iowa, is to beg the very question in dispute. In deciding this question the Court is called upon, as the Court in Iowa was, to construe the Constitution of the State. It is a grave error to suppose that this Court must, or should, determine this upon any principle which would not be equally binding on the Courts of Iowa, or that the decision should depend upon the fact that certain parties had purchased bonds which were supposed to be valid contracts, when they really were not.

"The Supreme Court of Iowa is not the first or the only Court which has changed its rulings on questions as important as the one now presented. I understand the doctrine to be, in such cases, *not that the law is changed, but that it was always the same as expounded by the later decision,* and that the former decision was not, and never had been, the law, and is overruled for that very reason. The decision of this Court contravenes this principle, and holds that the decision of the Court makes the law, and, in fact, that the same statute or Constitution means one thing in 1853, and another thing in 1859. For it is impliedly conceded that if these bonds had been issued since the more recent decision of the Iowa Court, this Court would not hold them valid. Not only is the decision of the Court, as I think, thus unsound in principle, but it appears to me to be in conflict with its former decisions on this point, as I shall now attempt to show." He then reviews previous decisions of the Court, and says: "It is attempted, however, to distinguish the case now before us

from those first considered by saying that the latter relate to
what is rather ambiguously called a rule of property, while
the latter concerns a matter of contract. I must confess my
inability to see any principle on which the distinction can
rest. All the statutes of the States which prescribe the for-
malities and incidents to conveyances of real estate would, I
presume, be held to be rules of property. If the deed by
which a man supposes he has secured to himself and family
a homestead, fails to comply in any essential particular with
the statute or Constitution of the State, as expounded by the
most recent decision of the State Court, it is held void by
this Court without hesitation, because it is a rule of property,
and the last decision of the State Court must govern, even to
overturning the well-considered construction of this Court.
But if a gambling stockbroker of Wall street buys, at twenty-
five per cent. of their par value, the bonds issued to a railroad
company in Iowa, although the Court of the State, in several
of its most recent decisions, has decided that such bonds were
issued in violation of the Constitution, this Court will not
follow that decision, but resort to some former one, delivered
by a divided Court, because in the latter case it is not a rule
of property, but a *case of contract.* I cannot rid myself of
the conviction that the deed which conveys to a man his
homestead, or other real estate, is as much a contract as the
paper issued by a municipal corporation to a railroad for its
worthless stock, and that a bond, when good and valid, is
property. * * * And when the construction of a Consti-
tution is brought to bear upon the questions of property or
no property, contract or no contract, I can see no sound reason
for any difference in the rule for determining the question."

After reviewing *Rowan* v. *Runnels,* and other cases cited
by appellants, he concludes : "I think I have sustained, by
this examination of the cases, the assertion made in the com-
mencement of this opinion, that the Court has, in this case,
taken a step in advance of anything heretofore decided by it
on this subject. That advance is in the direction of a usurpa-
tion of the right, which belongs to the State Courts, to de-
cide as a finality upon the construction of State constitutions
and State statutes. This invasion is made in a case where
there is no pretense that the Constitution, as thus construed,

is any infraction of the laws or Constitution of the United States."

In *Town of South Ottawa* v. *Perkins*, 94 U. S. 260, which was an action by a holder of bonds purporting to have been issued under an Act of the Legislature of Illinois, the defense was that the act had never in fact been passed, although it had been duly published among the printed statutes as a law. This defense was overruled by the Court below, on the ground that the holder of the bonds was a *bona fide* purchaser, without notice of any objection to their validity; that the first installment of interest was paid at maturity, and that the act as published was *prima facie* a valid law, and that the town, under the circumstances, was estopped from denying its passage. The Supreme Court, through Mr. Justice Bradley, said: " We can not assent to this view. There can be no estoppel in the way of ascertaining the existence of a law. That which purports to be a law of the State, is a law or it is not a law, according as the truth of the fact may be, and *not according to the shifting circumstances of parties.* It would be an intolerable state of things if a document, purporting to be an Act of the Legislature, could thus be a law in one case and for one party, and not a law in another case and for another party; a law to-day, and not a law to-morrow; a law in one place, and not a law in another in the same State."

So here we say the question whether this act is valid or not is to be determined according to the true construction of the constitution, and not according to the circumstance that A. or B. has purchased bonds at a particular time, and C. and D. have purchased them at some other time. It can not be constitutional as to one party and unconstitutional as to another; and the fact that one is a *bona fide* purchaser can have no effect upon the question. As said by Mr. Justice Bradley, "there can be no estoppel in the way of ascertaining the existence of a law."

In *Boyd* v. *Alabama,* 94 U. S. 645, a previous adjudication by the highest State Court that a statute constituted a contract, and, therefore, irrepealable, was held not to estop the State from subsequently denying its constitutionality, nor conclude the Court upon that question, although the point might have been raised and determined in the first instance.

It is true that the constitutionality of the statute was not expressly drawn in question in the first case, but moneys were subsequently paid into the State treasury, and acts performed upon the faith of the act and of the decision of the Court that it was a contract. The Supreme Court, however, said that "previous adjudications upon other points do not operate as an estoppel against the parties in new cases, nor conclude the Court upon the constitutionality of the act, because that point might have been raised and determined in the first instance."

Now, in *Doyle* v. *Austin*, the constitutionality of the act in question was assailed upon four several grounds, and the Court passed upon its constitutionality with reference to those grounds and none other. Those were the only matters argued or considered—the Court did not examine the act nor determine its validity as affected by any other ground of objection. As is said by the Court in *Boyd* v. *Alabama, supra,* "Their habit (that of Courts) is to meet questions of that kind when they are raised, but not to anticipate them." The constitution contains several, distinct, and independent inhibitions upon the legislative power, and an act, while not obnoxious to one or more of these, may be to others. Hence a Court does not necessarily determine that a statute is wholly free from objection on constitutional grounds because it decides it to be free from the particular constitutional objection which in a given case may be urged against it. Thus, because it was determined in *Doyle* v. *Austin* that this was an assessment and not a tax, and that the act was not unconstitutional on that ground, it was not determined, nor could any one understand that it was determined, that the act was not in conflict with the constitutional principle which forbade the direct imposition by the legislature of an assessment within the limits of an incorporated city. It is not pretended that the Court compared the act with the whole constitution and arrived at the conclusion that it comported with its provisions, and it seems to us that even according to the doctrine of the Supreme Court of the United States this Court is now only precluded from questioning the constitutionality of the statute upon the points actually made and passed upon in *Doyle* v. *Austin*, and that its constitutionality may be in-

quired into on every other point. This is but justice to the Court and to the persons who were not parties to the case, Surely if a statute were assailed only on some absurd or plainly untenable ground it can not be that other parties, strangers to that case, are precluded by the decision upon the points there raised from ever questioning upon grounds which are tenable, a statute which is a gross violation of the Constitution, and a violation of the rights and property of the particular citizens who now attack it.

But, whatever may be the scope of the decisions of the Supreme Court of the United States upon these subjects, and however far reaching in their application when applied by that Court, they are no more binding and conclusive in this Court in this proceeding than would be the decision of this Court on the same subject to that Court in another case in which it had jurisdiction.

The Supreme Court of the United States, in the decisions cited by appellant, certainly can not be claimed to have paid any particular regard to comity. Indeed it has clearly, in those decisions, overruled its own uniform doctrine, expressed in a multitude of cases, beginning almost with the origin of the Court and extending through more than half a century of its existence, by Marshall, McLean, Storey, and others of the illustrious men who have adorned that bench in the past.

This, Mr. Justice Miller clearly shows. Is it not the duty of this Court, in the exercise of its undoubted jurisdiction, to decide the law as the judges themselves understand it, controlled only by the better reason and their own consciences, under their oaths of office?

Would it not be monstrous to hold that in this proceeding to deprive a citizen of his property *in invitum,* he is to be conclusively estopped by the judgment in a case to which he was neither a party nor a privy, and in the consideration of which he had no opportunity to be heard? He has issued no bonds; he has encouraged no one in their purchase; no one authorized to speak for him has made any recitals; he has never had his day in Court; in fact, there is no valid assessment on his property. The law, under which it is claimed he is to be sold out, is unconstitutional and wholly void; the assessment itself is null; and yet there is no Court in which

he can be protected from spoliation and robbery. If this be law, it is time to return society to its original elements and begin anew to rebuild the fabric of social law and order upon a new foundation.

Whatever may be said about negotiable municipal bonds, it can not for a moment be questioned that the purchaser of those securities was bound to know that the only means for their payment was from a fund to be raised *in invitum* upon certain property in a district; that in such cases the property owner is entitled to a strict construction of all the proceedings, and that every one claiming the right to divest him of his property for that purpose, must show the absolute right to do it, based upon a valid statute, with proceedings in all things regular. This went with these bonds; of every one of them it was as much a part as what was written therein, and of them there could be no *bona fide* purchaser for value in any sense, that would prevent the property owner from maintaining his every legal right.

*Philip C. Galpin,* also for Respondent.

The principles and presumptions of law applied to commercial paper to protect and extend its negotiability, do not apply to a statutory power unper which the citizen unwilling is deprived of his property for non-payment of a tax or assessment imposed by government. Negotiability can not impart vitality to a bond executed under a power wherein the agent had exceeded his actual or presumptive authority, much less could the negotiability of that bond ratify the void sale of him who sold property under a statutory power, even if the proceeds of the sale were to be used to liquidate the bond.

*Theodore H. Hittell,* also for Appellant.

The argument of appellant is framed as if this were a suit upon the bonds, instead of an action of ejectment.

*James Mee, John T. Doyle,* and *Harmon & Galpin,* also for Respondent.

McKEE, J.:

Ejectment to recover possession of certain premises described in the complaint as that portion of fifty-vara lot number 3,

in block number 559, of the Western Addition of the City and County of San Francisco.

The right of recovery, claimed by plaintiff, depends wholly upon a tax deed which had been executed and delivered to him in consummation of a sale of the premises, for the non-payment of an assessment, which had been levied upon the land, for the purpose of raising a fund for the payment of interest, due and to become due, upon one thousand five hundred and seventy-five bonds, of one thousand dollars each, which had been issued under the provisions of an act entitled, "An act to open and establish a public street in the City and County of San Francisco, to be called Montgomery avenue, and to take private lands therefor," approved April 1, 1872. Judgment in the Court below was entered in favor of the defendant, from which, and from the order denying a motion for a new trial, the plaintiff appeals.

At the trial of the cause the following stipulation was made:

"It is hereby stipulated by and between the parties to the above entitled action, as follows: That the deed of William Mitchell, Tax Collector, to the said plaintiff, of the land in dispute in said action, offered in evidence by the plaintiff, is *prima facie proof of title* to said land, subject to attack by defendant upon the grounds only:

"1. That the statute under which Montgomery Avenue is alleged to have been opened, gave no authority to the Board of Public Works, or to the County Court of said City and County, to act in the premises, as in said act provided.

"2. That the Board of Public Works, as provided for in said act, never acquired jurisdiction over the matters alleged to have been determined by them under the alleged authority of said act.

"3. That the alleged report of said Board to said County Court, as provided for in said act, was unauthorized and void.

"4. That said County Court had no jurisdiction to confirm said report, and that the confirmation thereof was unauthorized and void.

"5. That no assessment for any tax on the property in said act described, is by said act authorized.

"6. That by said act no power is given to any Tax Col-

lector to sell any premises for non-payment of any tax nor to
deliver any deed under such sale.

"All other defenses and objections to the plaintiff's title are
hereby expressly waived; in consideration of which, each
party agrees to press said case to as speedy adjudication
thereof, as is possible, and either party may read in evidence
on the trial, any book, petition, exhibit, or evidence used or
taken in the trial of *Dutertre* v. *Ford,* case No. 4,800 in said
Court, subject to any legal exceptions that may be taken
thereto."

Under that stipulation the plaintiff put in evidence his tax-
deed and rested. The defendant then put in evidence the record
of the petition, which had been presented to the Mayor of the
City and County of San Francisco, on the 6th day of April,
1872, under section 4 of the statute already referred to, for
the opening of Montgomery Avenue; a copy of the assess-
ment roll of that city and county for the fiscal year 1871–2,
the testimony of certain experts, which tended to show,
upon a comparison of the petition and the assessment roll,
and a computation made thereon, that the petition had not
been signed by the owners of a majority in frontage as
assessed on the assessment roll; and the testimony of certain
witnesses, which tended to prove that the name of a corpora-
tion, to whom certain frontage was assessed on the assessment
roll, was signed to the petition by officers of the corporation
without authority.

It was agreed that the copy of the petition and of the
assessment roll were correct copies of the originals, and no ob-
jections were made to them as evidence. But, while the wit-
nesses were testifying, the plaintiff objected to any testimony
to impeach either, upon the ground that it was irrelevant and
immaterial. His objections were overruled, the testimony of
the witnesses was taken over his exception, and upon the evi-
dence thus admitted the Court found that the total frontage
in the district was four hundred and twenty and six hundred
and thirty-seven and one half thousandths feet, of which two
hundred and ten and three hundred and nineteen thousandths
feet constituted a majority. Upon its face the petition repre-
sented signatures for two hundred and twenty-five and three
hundred and twenty-four thousandths feet—being a majority.

of fourteen and nine hundred and forty-two and one half thousandths feet.

But of the two hundred and twenty-five and three hundred and twenty-four thousandths feet signed, eight and nine hundred and ninety-one and one half thousandths feet were signed for by executors, administrators, agents, etc., to whom the frontage was not assessed upon the assessment roll; four and two hunhundred and seventy-three thousandths feet thereof were signed for by persons whose names were not on the assessment roll at all; seventeen and one hundred and seventy-three thousandths feet thereof were signed for by one only of several tenants in common, but not by all the persons to whom the property was assessed on the assessment roll; seven and six hundred and seventy-one and one half thousandths feet thereof were assessed to the United States and other parties, but were not signed for by the United States; thirty-nine and eight hundred and forty-two thousandths feet thereof were assessed on said roll to the North San Francisco and Railroad Association, a corporation, and appeared to be signed for by one F. S. Spring, President, and —— Barry, Secretary, who had no authority from the Board of Trustees of the corporation, or otherwise, to sign the petition; and twenty-nine and nine hundred and fourteen thousandths feet thereof were assessed on said roll to the same corporation jointly with other parties, some of whom owned undivided interests in certain lots—seven and seven hundred and thirty-nine thousandths feet of which were signed by the owners, six and one hundred and thirty-six thousandths feet of which were not signed by the owners, and eleven and thirty-seven thousandths feet were signed for in the name of the corporation by F. S. Spring, President, and —— Barry, Secretary, who had no authority from the Board of Directors, or otherwise, to sign. Subtracting these several amounts from the two hundred and twenty-five and three hundred and twenty-four thousandths feet appearing on the petition, there remained a balance of several thousand feet frontage less than a majority of the owners in frontage; from which the Court deduced the fact that the petition, which had been presented to the Mayor, was not signed by a majority of the owners in frontage as required by the statute; the petition was, therefore, wholly insufficient, and was as no petition, and, therefore, the Board of Public Works, created.

by the statute, had no authority to levy any assessment upon the property in controversy, and the County Court had no jurisdiction to confirm the same, and the entire proceedings for the assessment and sale of the property were invalid and void, and the tax deed transferred no title to the plaintiff.

The appellant assigns as error that the findings of fact are not sustained by the evidence, and that the conclusions of law are not sustained by the findings.

The petition and assessment roll in evidence disclosed all the facts upon which the Court made its findings as to the *quantum* of frontage, signed by those who are represented on the petition as executors, administrators, agents, and tenants in common. The assessment-roll showed that there had been no assessment to them; there was, therefore, no conflict of evidence. If there was any conflict, it existed only in the testimony of the witnesses upon the question of authority in those who signed the name of the Homestead and Railroad Association to the petition. But, at the least, there was sufficient in the testimony to justify the Court in finding, as it did, that the signature of the corporation to the petition by the President and Secretary of the corporation was wholly unauthorized. That being the case, the burden is upon the appellant, who assigns as error that the finding is not sustained by the evidence, to show that the finding is contrary to the evidence. We have carefully examined the record on that subject, and fail to find any evidence whatever of authority from the Board of Directors to the President or Secretary to sign the name of the corporation to the petition. The officers who affixed the signatures of the corporation to it deny that they had any special authority. In his testimony, the President says: "I signed the petition because I personally wanted the avenue opened, and I thought it was well for the Association to have it opened." "I do not remember that I ever consulted the Directors in relation to signing the petition, or that they ever knew that I had signed, or that the matter was ever talked over at any meeting of the Directors."

Appellant, however, contends that the Directors knew that the petition was signed, and that they assented to it and ratified it, because it was shown by the evidence that nine days before the act of 1872 was passed and two months *before* the

petition was signed, the Board of Directors passed the following resolution :

"Resolved, that the President be and is hereby authorized to take such steps as he may deem advisable for the purpose of securing the passage of the bill for opening Montgomery Avenue, and the sum of five hundred dollars be and is hereby appropriated out of any moneys in the treasury and placed at his disposal for the purpose of defraying the necessary expenses of such action in the premises as he may determine upon."

And the President testified that "the five hundred dollars referred to in the resolution of March 20th, 1872, was paid to some one that had it; I could not say exactly to whom. It was paid after the passage of the act, because my signature was made for it. My recollection is, that I signed an agreement with some one to pay five hundred dollars if a certain bill then before the Legislature was passed. I think the bill was amended considerably. I paid the money for the passage of this act."

However suggestive this testimony may be of some things, of which, in the judgment of charity, the witness may be entitled to the benefit of a reasonable doubt, it does not tend to prove authority in the officers of the corporation to sign the name of the corporation to the petition for the opening of the avenue. Nor does a resolution of the Board, passed several months *after* the petition was signed, authorizing the President "to subscribe, on behalf of the Association, to a fund with a view to procure such action as will result in levying the Montgomery Avenue tax on the whole City of San Francisco," show such authority, or that the Directors knew that the name of the corporation had been signed to the petition by its President and Secretary, or that they approved of it, or acquiesced in it, or ratified it.

The findings are, therefore, sustained by the evidence, and the conclusions of law drawn from them are correct. For, while it is true, that a corporation can act only by its agents, and the presumption is, that an act pertaining to its ordinary business is, when performed by its President and Secretary, legally done, and is binding upon the corporation (*Smith* v. *Smith*, 62 Ill. 493), yet no such presumption prevails when

the act done by such officers does not fall within the scope of powers conferred upon and usually exercised by them as part of the ordinary business of the corporation. The act of signing the name of a corporation to a petition for the opening of a highway over its real property is one which falls within the managing powers of the Board of Trustees or Directors, who are, by law, made the managing agents of the corporation; and authority to perform such an act must come from them. The corporation laws of the State have not conferred upon the President and Secretary of a corporation, or either of them, authority to perform an act of that character.

It is also equally clear, as a conclusion of law, that executors, administrators, and agents, to whom, as such, no frontage was assessed on the assessment roll, were not owners, within the meaning and intent of the statute, who were authorized to petition for the opening of the avenue.

Executors and administrators are but the legal personal representatives of the decedents whom they represent. They are but agents of their constituents, created by law, whose duties and powers are prescribed by law. Whatever they do must be done according to law, and within the authority of the law; for the acts of an agent are binding only when done within the scope of the authority conferred upon him. In any transaction in which executors or administrators pretend to act as such, they can not create any liability on the estate of which they are the representatives. They have no power to charge or incumber, or sell and convey, the real property of the estate, unless authorized by the law under which they are acting. In favor of such an act there is no legal presumption. If it purports to be done by authority, the authority should be produced. The signatures of the executors, administrators, and agents to the petition were, therefore, ineffectual as signatures of the frontage for which they signed.

And where real property is assessed upon an assessment roll to two or more persons, the legal presumption is that all are joint owners. Being the common property of all, one of the joint owners or tenants in common can not do any act in hostility to the common title. He can not, by his act alone, attempt to incumber or charge the estate of his co-tenants.

If he signs a petition for the opening of a street over the common lands, which will lead to the assessment of the lands to pay the cost of opening the street, his signature affects only his own estate; he does not represent or bind the estate of his co-tenant. No one can do that without special authority.

But it is contended, and the next assignment of error is, that the Court below erred in admitting any evidence at all to contradict the petition, because it was not essential to the exercise of the powers conferred by the statute upon the Board of Public Works for the opening of the avenue; because the certificate of the Mayor, that the petition was sufficient, was conclusive as an adjudication of the fact, which could not be called in question in a collateral proceeding; and because, as the defendant had failed to question its sufficiency or validity in any of the tribunals provided by the statute for that purpose, while the proceedings, which the petition had inaugurated, were *in fieri*, he and the other property owners, affected by the proceedings, were estopped. If the petition was essential, it was not error to allow accountants to compute the frontage of the assessment district, and to examine and compare the petition and the assessment-roll, to ascertain and testify to the number of feet frontage represented on the petition and the number assessed on the assessment-roll. It is true, that the petition and roll were both before the Court as unquestioned evidence; and the Court, in the exercise of its judicial functions, could have contrasted the two documents, and ascertained and computed any discrepancies existing between the frontage represented on the one and that assessed on the other. But it had the power, as every Court has, to take the testimony of experts to assist it in getting at those results, so that, upon a judicial examination of the documents themselves, it may be enabled intelligently to deduce a correct conclusion upon the question, whether the number of feet frontage as represented on the petition consisted with the names of the owners and the frontage represented by them on the assessment-roll.

Nor was there any error in admitting the testimony of witnesses to prove that the signatures of the Homestead and Railroad Association to the petition were signed by persons

who had no authority. Forgery, fraud, illegality, want of capacity to execute, or want of due execution, are always proper subjects of oral evidence. The evidence was, therefore, admissible, unless the petition to which it related was not necessary at all, or if necessary, its validity had been conclusively adjudicated, or the defendant was estopped from questioning it. And it is upon these questions mainly that the rights of the parties to this controversy turn.

In considering them, it must be borne in mind that this is not an action upon the bonds issued under the provisions of the statute; it is an action of ejectment, pure and simple, in which the plaintiff seeks to cut off the title of the defendant to the land in controversy by statutory proceedings, taken against the property, by agents of the State, in the exercise of the powers of eminent domain, assessment, and taxation. The two actions are essentially different. An action upon the bonds would be an action on contract, in which· the defendant to the action might be estopped from calling in question the validity of the proceedings under which the bonds were issued. While in an action of ejectment to recover property upon the validity of such proceedings, the owner would not be estopped from questioning them where they were taken against his will, and he was not a party to them.

Now the statute made the petition an essential initiative of the proceedings under which the plaintiff claims title to the property in controversy. By the statute the Legislature came into the municipality of the City and County of San Francisco, to open and establish a public street therein. That was the sole object, as expressed in the title of the Act. To carry out that object, the Legislature, by section 1 of the Act, described a tract of land, by metes and bounds, and by courses and distances, which it declared as taken and dedicated for the purpose of establishing the street. That that tract of land is now known as Montgomery Avenue. And in order to raise funds to pay the cost of opening the avenue, the Legislature, by section 3 of the Act, defined what should constitute the "cost;" and by section 4 it established an assessment district, described its boundaries, and declared that all the lands situated within those boundaries would be benefited by the opening of the avenue; and that the "cost" of open-

ing it should be levied upon them, according to the standard of apportionment of benefits established by section 12, by agents appointed by the act, whom it created and designated as a Board of Public Works, within the meaning and intent of the act.

Having thus taken and dedicated the land for a public street, established an assessment district, declared the lands which would be benefited by the opening of the street, apportioned the benefits, prescribed the means, and appointed the agents for the accomplishment of the objects of the act, the Legislature made the organization of the agency and the exercise of its powers dependent upon the will of the owners of a majority in frontage of the lands, which were subjected to the burdens of paying for the improvement, to be manifested by petition to the Mayor of the city, who was president of the Board. By section 5 of the act it was provided that "whenever the *owners of a majority in frontage* of the property described in section 4 of this act, as said owners are *or shall be named* in the last preceding annual assessment roll for the State, city, and county taxes, shall petition the *Mayor* of said city and county, in writing, for the opening of Montgomery Avenue, according to the provisions of this act, the Board of Public Works, as created by section 19 of this act, *shall proceed to organize by the election of a President,*" etc.

Now, assuming that the State may come into a municipality for the purpose of exercising, by its agents, the power of assessment, to pay for land within the municipality which it had taken and dedicated for a public highway, it must come under the statute which has determined the necessity for the appropriation and conferred the powers to be exercised; and statutory powers, under such circumstances, must be exercised under the limitations and circumstances prescribed by the statute itself. None of the safeguards created by it for the protection of the citizen can be disregarded. "The power of the State," says Mr. Cooley, in his work on Constitutional Limitations, "to appropriate private property for public use by taking it under the power of eminent domain, or of taxation by way of assessment, however absolute in the abstract, is a dormant power until legislative action is had, pointing out the occasion, the mode, the condition, and agencies for the

appropriation." (§ 528.) It is no objection to the mode of exercising the powers conferred upon the agents under the statute, that the Legislature has referred it to the consent of those whose property is to be burdened by the "cost" of making the improvement. The power of the Legislature to prescribe that as a condition precedent is unquestionable. (*Potter* v. *Ames,* 43 Cal. 75.)

When, therefore, the Legislature prescribed that a petition from the owners of a majority in frontage of the property to be charged with the cost of the improvement was necessary to set the machinery of the statute in motion, no step could be taken under the provisions of the statute until the requisite petition was presented. It was the first authorized movement to be made in the opening of the avenue. When taken, officers who were to constitute and organize a Board of Public Works were authorized to organize. Until it was taken they had no such authority. They could not legally act at all; or if they acted, their proceedings would be unauthorized and void. The presentation of the petition required by the statute was therefore essential. It was, as other courts, in construing similar statutes, have expressed it, a jurisdictional fact, that may not be presumed or inferred, upon which rested all the subsequent proceedings authorized by the statute. (*Matter of the City of Buffalo,* 78 N. Y. 362; *People ex rel. Rogers* v. *Spencer,* 55 id. 1; *Litchfield* v. *Vernon,* 41 id. 123; *People* v. *Smith,* 55 id. 135; *Sharp* v. *Spier,* 4 Hill, 87; *Graves* v. *Otis,* 2 id. 466; *Dampe* v. *Town of Dane,* 29 Wis. 419.) "A common requirement," says Mr. Cooley, in his work on Taxation, 464, "is that the improvement shall be asked for or assented to by a majority or some other proportion of those who would be taxed. The want of a compliance with this requirement is fatal in any stage of the proceedings."

But it is urged that, as a petition sufficient upon its face was presented, and as the Mayor to whom it was presented, certified it to be in all respects in accordance with the statute, the defendant is now estopped from questioning the validity of the petition or of any of the proceedings under which his property has been assessed and sold; first, by the certificate of the Mayor, and secondly, by the judgment of the County

Court in confirming the report of the Board of Public Works, under section 7 of the act.

The statute required the petition to be made to the Mayor; but he was charged with no duties in connection with it. He was not authorized to enter into any investigation of the frontage as represented by the petition, or to adjudicate its sufficiency, or to make any record in reference to it. He did append to it a certificate, but this certificate was unauthorized; and it is difficult to see how the unauthorized certificate to a document of a ministerial officer constitutes an estoppel.

But it is urged that while the statute has not, by direct terms, conferred power upon the Mayor to decide upon the sufficiency and validity of the petition, he, of necessity, had such power, because the statute required that it should be presented to him, and, as it is not to be presumed that the Legislature intended a vain thing, it must be inferred that the officer to whom it was presented was authorized by the statute to determine whether it was in accordance with the statute or not, and that his determination of that fact was in the nature of an adjudication. But, even if that were so, the adjudication of the question would not be conclusive. A property owner would have the right to rebut it as evidence, when called upon for the first time to defend his rights to property affected by the proceedings of which the petition was the initiative, unless the statute provided for giving him notice of the presentation of the petition, and notice was in fact served upon him. If he had no such notice, and no opportunity to be heard upon it, it is difficult to see how he can be concluded by an adjudication to which he was not a party and of which he had no notice. For it is a principle which underlies all forms of government by law, that a citizen shall not be deprived of life, liberty, or property, without due process of law. The Legislature has no power to take away a man's property, nor can it authorize its agents to do so, without first providing for personal notice to be given to him, and for a full opportunity of time, place, and tribunal, to be heard in defense of his rights. This Constitutional guaranty is not confined to judicial proceedings, but extends to every case in which a citizen may be deprived of life, liberty, or property, whether the proceeding be judicial, administrative, or

executive in its nature. (*Wiemer* v. *Bonemburgh*, 30 Mich. 201.)

In no part of the statute does it appear that any provisions were made for any notice to be given to property-owners of the proceeding authorized to be taken before the Mayor, or of the proceedings by the Board of Public Works, or in the County Court, against the property declared to be benefited by the opening of the avenue. No personal notice was in fact given to the defendant of the presentation of the petition or of any of the acts of the Board. Neither the Mayor nor the Board was required to give notice until the Board had completed the report of its work. Then the statute required it to publish a notice for twenty days, in two daily newspapers printed and published in the City and County of San Francisco, that the report would be open for the inspection of all parties interested, at the office of the Board, every day during ordinary business hours, for thirty days. (§ 6.)

This notice was not directed to the defendant or any property owner by name. It was not personal notice. It was simply a general notice that the report of the Board was open for inspection. It did not notify or summon any property owner to appear before the Board or the County Court, or any other tribunal, at any time or place, to file objections, or assert rights to or against anything which had been done by the Board in its proceedings against the property to be charged with the cost of opening the avenue. It is true that if any property owner felt himself aggrieved by the report, he had the right, under the statute, at any time within the thirty days specified in section 6, to apply to the County Court of the city and county for an order on the Board re quiring it to file its report in the County Court. Upon such an application the County Court was empowered to grant or deny the order. But if no such application was made the Board itself was required after the thirty days to present the report to the County Court, and ask for its approval and confirmation. (§ 7.) But whether the report was brought before the County Court upon an order made on the application of a party in interest, feeling himself aggrieved, or by the Board itself, the Court had only such jurisdiction of the subject-matter of the report as was conferred upon it by the

statute. These powers are thus specifically described by section 7 of the statute: "The Court shall have power to approve and confirm said report, or refer the same back to the said Board, with directions to alter or modify the same in the particulars specified by the Court in the order referring the same back, and thereupon the said Board shall proceed to make the alterations and modifications specified in the order of said Court. The alterations and modifications aforesaid being made, the report shall be again submitted to the said Court, and if the court, upon examination, shall find that the alterations and modifications have been made according to the directions contained in said order, the said Court shall approve and confirm the same by an order to be entered upon its minutes; but if the said Board shall have neglected or failed to make the alterations and modifications set forth in the order of reference, the Court may again refer the report back to said Board, and so on until its original order of alteration and modification shall have been complied with by said Board, and then said Court shall approve and confirm said report."

These constituted the only powers which the County Court, as a Court of special and limited jurisdiction, was authorized to exercise. The principal thing with which the Court had to deal was the report, and "such data or documents as had been used by the Board in its preparation." Its entire duty, as derived from the statute, was to approve and confirm the report, or refer it back to the Board for the purpose of changing it in such respects as the Court might by its orders direct; and when changed or modified as directed, and returned, to then approve and confirm it. Of course the exercise of that jurisdiction involved a judicial examination of the report and of such data or documents as had been used in preparing it; but it extended no farther than a review of such matters for the single purpose of approval and confirmation of the report in its original form or as changed and modified by order of the Court. What the nature, character, and contents of the report were, and what the jurisdiction of the Court over it, are distinctly set forth in sections 6 and 7 of the act. Nowhere in the statute is the petition made part of the report, or of the data or documents used in making it.

Nor is it anywhere required that the Board or the Mayor shall return it to the Court or file it there or elsewhere. The Court had, therefore, no jurisdiction of the petition—no power to adjudge upon its execution, and it could not assume jurisdiction of it, or by its judgment decide upon its sufficiency and validity so as to conclude the defendant. And, in adjudicating upon the report itself, the Court acquired no jurisdiction of the person or property of the defendant, so as to determine his rights. Both, it is true, were within the territorial limits of the jurisdiction of the Court, but no actual or substituted process of law had been served upon one or the other. The hearing and determination of the proceedings taken by the Board for the opening of the avenue, of which he had had no notice, was, therefore, not a judicial proceeding to which he was a party, and in which he had his day in Court, or an opportunity to be heard as to his rights, according to the prescribed forms of law for determining the rights of property. The judgment of the County Court in reciting a jurisdiction which it had not, or a jurisdiction which it had, does not estop the defendant from questioning the jurisdiction and showing jurisdictional defects in proceedings by which it is proposed to deprive him of his property.

Nor does the failure of the defendant to resort to legal remedies against the proceedings while *in fieri* constitute an equitable estoppel. It was the duty of those who were authorized to exercise powers, which might bind the real property of the defendant, to see that the provisions of the statute under which they acted were complied with. · Their acts, in that respect, were either valid or void. If valid, a legal charge was created upon the property of the defendant. If void, a court of equity would not have afforded him any relief against them. It would have left him to stand on his legal rights. Under these circumstances, defendant was not bound to attempt resistance against the proceedings, until his right to his property affected by them, was called in question by some one claiming title to it through them. The plaintiff claimed such a title; and when he brought his action to establish a right of entry upon the land of the defendant, the latter was called upon, for the first time, to defend his rights. In such an action the plaintiff must recover upon the strength of his title,

His title was either valid or void. If the proceedings in which it originated were void, he had no title, and the defendant lost none by failing to resort to legal remedies against them before he was sued in ejectment. Under such circumstances, the doctrine of *laches* is wholly inapplicable.

It follows that the ruling of the Court below, in admitting evidence to show that the petition was not signed by the owners of a majority in frontage of the lands assessable for the opening of the avenue, under the statute, was correct; that the findings were sustained by the evidence; that the judgment is sustained by the findings, and that there is no prejudicial error in the record.

Two questions, one as to the constitutionality of the act of 1872, and the other as to the validity of the Montgomery Avenue bonds, have been elaborately argued by counsel. But as the one is not necessarily involved in the case, and the other is wholly outside the record, we express no opinion upon them.

Judgment affirmed.

SHARPSTEIN, J., concurring:

I concur in the affirmance of the judgment of the Court below. Section 19 of the act of April 1, 1872, declares that the Mayor, Tax Collector, and City and County Surveyor shall constitute a Board of Public Works within the meaning of that act; and section 5 provides that "whenever the owners of a majority in frontage of the property described in section 4 of this act as said owners are or shall be named in the last assessment roll for the State, City and County taxes, shall petition the Mayor of said City and County, in writing, for the opening of Montgomery avenue according to the provisions of this act, the Board of Public Works, as created by section 19 of this act, shall proceed to organize," etc.

The act did not authorize the Board to organize until after the owners of a majority of the frontage of the property, described in section 4, had petitioned the Mayor in writing for the opening of the avenue. As the Board was required to organize before proceeding to do anything else, it would seem that its right to do anything under the act depended upon the presentation of a sufficient petition to the Mayor, for the

opening of said avenue. If it was necessary that any petition should be presented to the Mayor before said Board could legally act, it was necessary that a petition of the owners of a majority of the frontage of the land described in section 4 should be so presented, before said Board could legally act. The difference between a petition by the owners of less than a majority of said frontage, and no petition at all, would be in a case like this immaterial. That Board derived its power to act solely from the statute, and the statute did not authorize it to take the first step before a petition of the owners of a majority of said frontage had petitioned the Mayor for the opening of said avenue. It may be conceded that the Legislature might have authorized the Board to do all the acts enumerated in said statute without a petition. Still it can not be denied that the Legislature might have made the authority of the Board to proceed at all depend upon the presentation of just such a petition as is prescribed by the act before us.

It appears from the record that no such petition was presented, in this case, to the Mayor, but that a petition of the owners of *less* than a majority of said frontage was presented to him; and that the Board organized, and did all the acts which it might lawfully have done if a sufficient petition had been presented to the Mayor. Were those acts valid? It is claimed that they were: 1. Because the Mayor or the Board, or both, had to determine whether the owners of a majority of frontage had petitioned; 2. Because the County Court was authorized to hear and determine any objection which any person interested in any of the land situated within the district benefited might make to any of the proceedings of said Board.

As before stated, it does not appear that the Board was authorized by the statute to do anything until the owners of a majority of frontage had petitioned the Mayor. The power is not directly given to any one to determine whether the requisite number had at any time so petitioned. The reason for that omission may have been, that the fact whether they had or not, was capable of mathematical demonstration. It only required a knowledge of the whole number of feet frontage, and a comparison of the petition with the last assessment roll of the city and county, to enable any one to de-

termine to a mathematical certainty whether or not the petitioners were the owners of the requisite frontage.

I think, however, that neither the determination of the Board, or of the County Court, or of both, would be anything more than *prima facie* evidence of the presentation of such a petition, as the law required; and that a petition of the owners of a majority of frontage was a condition precedent to the right of said Board to proceed at all in the matter.

Nothing is better settled than that, "where special authority is delegated by statute to particular persons, or to an inferior tribunal, affecting the property of individuals against their will, the course prescribed by law must be strictly pursued, and appear to be so upon the face of the proceedings, or the power is not well executed. And it makes no difference in the application of the principle, whether the question comes before the Superior Courts by *certiorari* or collaterally. If the law has not been strictly complied with, the proceeding is a nullity, *and the adjudication gives it no additional validity.*" (Blackwell on Tax Titles, 39.)

And when the requirement is, that an improvement *shall be asked for or assented to by a majority*, or some other proportion of those who would be taxed, a want of compliance with that requirement is fatal to any stage of the proceedings. "And any decision or certificate of the proper authorities, that the requisite application or consent had been made, would not be conclusive, but might be disproved." (Cooley on Taxation, 465.) So held in *Sharp* v. *Spier*, 4 Hill, 76, and in *Henderson* v. *Baltimore*, 8 Md. 352.

No Court or officer can acquire jurisdiction by the mere assertion of it, or by falsely alleging the facts on which jurisdiction depends. (*People* v. *Cassels*, 5 Hill, 168, *per* Bronson, J.; *Starback* v. *Murray*, 5 Wend. 158; S. C., 21 Am. Dec. 172; *Shumway* v. *Stillman*, 6 Wend. 452.)

The statement or recital, in a record of an inferior Court or tribunal, of facts constituting jurisdiction, may be received as *prima facie* evidence of such facts. (*Barber* v. *Winslow*, 12 Wend. 102; 11 Johns. 226; *Hubbell* v. *Ames*, 15 Wend. 372.) It was accordingly held, in *Harrington* v. *The People*, 6 Barb. 607, that if a statute authorized Commissioners to proceed and lay out a highway, upon the application of some person

liable to be taxed therefor, and they laid it out without such application being first made, the whole proceeding was void; and that an order made by a County Judge on appeal, affirming the action of the Commissioners, was likewise void. The Court said: "If the Commissioners had no jurisdiction of the application to lay out the road, their determination was void; and the appeal from that determination and the decision on the appeal were also void." That case was overruled in *Gould* v. *Glass*, 19 Barb. 179, as to the requirement of the statute, that an application should be made to the Commissioners before they could legally act. But it is not intimated that if the statute had required an application to be made before the Commissioners acted, that the doctrine of the earlier case would not be sound.

The jurisdiction conferred upon the County Court in this case was purely special, and depended, I think, as much upon the presentation of a proper petition to the Mayor as that of the Board did. Besides, it does not seem to have been contemplated in the act that the question of the sufficiency of the petition should be considered by the Court. There is no evidence of a waiver by the defendant of his right to contest the legality of the acts of the board in any proceeding based upon them which might affect his property. He waived nothing by his silence, and his right to resist the collection of the tax is not affected by the unauthorized acts of others.

In *Carron* v. *Martin*, 26 N. J. L. 594, the question was whether the proceedings of the Common Council of the city of Newark, in opening the street for which the assessment was made, were void for want of a proper application of the land owners for that purpose, so that the sale of land made to raise the sum assessed thereon was void and conferred no title on the purchaser. The Court in a lengthy and able opinion discussed the various points raised by counsel, and arrived at the conclusion that the want of an application such as the law prescribed, made the subsequent proceedings of the board *coram non judice* and void; and liable to be attacked in a collateral proceeding like the present.

If it had been the intention of the Legislature to make the determination of the Board, or of the County Court, conclusive upon the question of the sufficiency of the petition,

we might reasonably expect to find some provision in the act for a hearing upon that question. But there is none. Nor is there any provision for giving notice of the presentation of such a petition to the Mayor. It is said that the parties interested were bound to take notice of the law. If that be so they took notice that the Board was not authorized to proceed until such a petition as the law prescribed had been presented to the Mayor, and they had a right to assume that the Board would not attempt to proceed until after such a petition had been presented. And the Legislature seems to have so assumed. Otherwise it would have made some provision for the determination of that question. The provision that the Board after their report was completed should give notice by publication in a newspaper that it was open for inspection in their office was not notice to any one that a petition had ever been presented to the Mayor for the opening of said avenue, and the law did not intend that it should be.

It is true that any person interested in any land within the district, " feeling himself aggrieved by the action or determination of the said Board as shown in said report" (the report which the law required the Board to make), might apply to the County Court for an order requiring the Board to file their report in the County Court. But the law does not require that the petition or a copy of it shall be set forth, or that any reference shall be made to it, in said report. From which it is obvious that the petition would not be before that Court. And this is made more clear by the following provision: " The Court shall have power to approve and confirm said report, or refer the same back to the said Board, with directions to alter or modify the same in the particulars specified by the Court." But the person who makes the application is not, nor is any one, required to give any other party in interest any notice whatever of such application, or of any proceeding under it.

Therefore, it seems to me, that if a petition of the character specified in the act was a condition precedent to the right of the Board to proceed, nothing has occurred since which can be construed as a waiver of that condition, or which estopped the respondent in this case from attacking the validity of the proceedings of the Board on the ground that such a,

petition as the law required as a foundation for such proceedings was never presented to the Mayor.

THORNTON, J., concurred in the above opinion of Mr. Justice SHARPSTEIN.

ROSS, J.:

I concur in the judgment. I think it beyond question that the act of the Legislature adopted April 1st, 1872, required, as a condition precedent to the opening of Montgomery avenue, the presentation to the Mayor of a petition in writing by the owners of a majority in frontage of the property declared to be benefited, and therefore assessed to pay the costs, as such owners should be named in the last preceding annual assessment roll for the State, city, and county taxes. Such petition lay at the foundation of the whole proceeding. Without it, no step could be taken looking to the opening of the avenue. It was jurisdictional in the strictest sense. The statute did not in terms provide how or by whom should be determined the question whether a majority of the owners in frontage of the property to be assessed had in fact petitioned for the opening of the avenue; but it is strenuously urged by some of the learned counsel for the appellant that the Board of Public Works of necessity had to decide it, and that their determination is conclusive. It is undoubtedly true that the members of the Board were called upon to decide for themselves whether a case had arisen in which it was proper for them to act. Indeed, by the express letter of the statute the Board could not even organize until a majority of the owners in frontage of the property to be assessed should petition for the opening of the avenue. While, therefore, the members of the Board were, from the very nature of the case, called on to decide for themselves whether such petition had been presented as authorized them to organize and proceed with the work, yet their determination was not conclusive upon any one. As said by Judge Bronson, in speaking of the action of certain trustees in respect to a similar petition, in *Sharp* v. *Spier*, 4 Hill, 88, "they could not make the occasion by resolving that it existed. They had power to proceed if a majority petitioned, but without such a petition they had no

authority whatever. They could not create the power by resolving that they had it." To the same effect is the language of Judge Cooley in his work on taxation, at pages 464, 465, where, in speaking of proceedings in assessment, he says: "A common requirement is that the improvement shall be asked for or assented to by a majority or some other proportion of those who would be taxed. The want of a compliance with this requirement is fatal in any stage of the proceedings. *And any decision or certificate of the proper authorities that the requisite application or consent has been made, would not be conclusive, but might be disproved.*"

How could the rule be otherwise in a case like the one at bar, where the statute makes the petition the basis of the proceeding which is to culminate in divesting the title of the owner of land against his consent, and makes no provision for the owner to be heard upon the question of the sufficiency of the petition? Nowhere does the statute provide for notice to the owners of the land to be assessed of the presentation of the petition to the Mayor, nor are such owners afforded an opportunity to contest before the Mayor or the Board of Public Works the sufficiency of the petition. Under such circumstances, to hold the owner conclusively bound by the determination of the Mayor or the Board, or both combined, would be, in effect, to deprive him of his property without due process of law, contrary to the provisions of the Federal and State Constitutions.

Nor did the statute give to the County Court jurisdiction to inquire into the sufficiency of the petition. Every one must admit that, in the matter in question, that Court had only such power as was expressly or by necessary implication, conferred upon it by the statute itself. Looking at the statute, it is seen that the Board of Public Works, after organizing upon the condition stated and adopting surveys, plans, etc., was required to state and set down in a written report, to be signed by at least a majority of the Board, the description and actual cash value of the several lots and subdivisions of land included in that taken for the avenue, the amount of damage that would be occasioned to the property along the line and within the course of the avenue, and, also, a description of the several subdivisions and lots of land included in

the district declared to be benefited by the improvement, together with the amount in which, according to the judgment and determination of the Board, each lot and subdivision in the district, relatively considered, had been or would be benefited by reason of the opening of the avenue. This report, as soon as completed, was required to be left at the office of the Board daily, during ordinary business hours, for thirty days, for the free inspection of all parties interested, and notice that the same was so open for inspection for such time and at such place was required to be published by the Board daily for twenty days in two daily newspapers printed and published in the City and County of San Francisco. It is not necessary, in my view, to comment upon the nature of this notice further than to say that it directed the attention of the parties in interest only to the report of the Board, which did not embrace the petition presented to the Mayor.·

The statute next authorized any person interested in any of the land situated within the district declared to be benefited, or in any of the land taken for the avenue, or in any improvements damaged by opening the avenue, who should feel himself aggrieved by the action or determination of the Board, *as shown in its report*, to apply by petition, at any time within the thirty days already mentioned, to the County Court of the City and County of San Francisco, setting forth his interest in the proceedings had before the Board, and his objections thereto, for an order requiring the Board to file with the Court its report, and such other documents or data as should be pertinent thereto in the custody of the Board and used by it in preparing the report. After notice to the Board the Court was empowered to hear the application and take testimony, and to allow or deny the order as to it should seem proper. If granted, the Board was required to obey the order. ·In the event no such application was made to the Court within the time limited, the Board was required to present the report to the County Court, with a petition that the same be approved and confirmed. In no event was anything but the report, and such documents and data as were used by the Board in its preparation, to be brought before the County ·Court. Nowhere did the statute expressly or by implication

authorize the County Court to inquire into the sufficiency of the petition presented to the Mayor.  On the contrary, its language, already given in substance, clearly limits the action of the Court to the report and the data upon which it was based. This is further and still more clearly shown by the following provision of the statute, in terms defining the power of the County Court: "The Court shall have power to approve and confirm said report, or refer the same back to the said Board, with directions to alter or modify the same in the particulars specified by the Court in the order referring the same back, and thereupon the said Board shall proceed to make the alterations and modifications specified in the order of said Court. The alterations and modifications aforesaid being made, the report shall be again submitted to the said Court, and if the Court, upon examination, shall find that the alterations and modifications have been made according to the directions contained in such order, the said Court shall approve and confirm the same by an order to be entered on its minutes; but if the said Board shall have neglected or failed to make the alterations and modifications set forth in the order of reference, the Court may again refer the report back to said Board, and so on until its original order of alteration and modification shall have been complied with by said Board, and then said Court shall approve and confirm said report."

In view of these provisions of the statute, and in view of the fact that the County Court had no jurisdiction, except such as was conferred by them, there is, and can be, in my opinion, no ground for the assertion that that Court could have *set aside the report and dismissed the whole proceedings for the opening of the avenue,* which, of course, it could have done, and would have been bound to do, could it have inquired into the petition presented to the Mayor, and ascertained that it was not made by a majority of the owners of the property to be assessed for the improvement.

The statute having failed to provide the parties in interest an opportunity to be heard upon the question of the sufficiency of the petition, on which the whole proceeding was made to depend, I consider it very clear that such parties can not be conclusively bound by the *ex parte* determination of that question by anybody.  It is the rule, everywhere recog-

nized, that every statutory authority, in derogation of the common law, to divest the title of one and transfer it to another, must be strictly pursued, or the title will not pass. In this case the defendant's right of possession is challenged by one who asserts title under such a statute. Until attacked, defendant was not called upon to defend. The asserted title is founded upon the petition to the Mayor; for, as already observed, unless a majority of the owners in frontage of the property to be assessed for the improvement petitioned for it, no step could be taken in the proceeding which was to culminate in a deed, such as the plaintiff claims under. The Court below found, upon evidence which sustained the finding, that a majority of such owners never did petition for the improvement. Hence I think the conclusion inevitable that the plaintiff has made out no title to the land in dispute.

McKINSTRY, J., concurring:

To what has been said, I add: In my opinion, the statute provides no notice or *process,* by means of which the property-owners can be subjected to the judgment of the County Court. The act is therefore void. (*Stuart* v. *Palmer,* 74 N. Y. 183; *Murray's Lessees* v. *Hoboken Land and Imp. Co.,* 18 How. (U. S.) 272; Cooley on Tax. 266.)