## WATKINS *v.* GRIFFITH.

### Opinion delivered June 23, 1894.

1. *Local improvements—Validity of assessments.*

    A city of the first class has no authority to assess property for a local improvement, under Mansf. Dig., secs. 826–837, until a majority in value of the owners of real property in the proposed improvement district shall have presented to the council a petition, in compliance with the statute, praying that such improvement be made.

2. *Improvement district—Consent of majority necessary.*

    The consent, to a proposed local improvement, of a majority in value of the owners of real estate in the district to be affected is an essential prerequisite; and a failure to obtain such consent is fatal to all proceedings under the statute, and renders them null and void.

3. *Power of board to alter plans—Injunction.*

Where, in a proceeding to form an improvement district, the petition of a majority in value of the property owners in the proposed district asked that the street to be improved should be "graded, rolled, shaped and graveled," the board of improvement was not authorized to substitute for the improvement asked an entirely different and more expensive improvement, consisting of macadamizing the street and building stone curbs and gutters, and the collection of all assessments to pay for the latter improvement will be enjoined.

4. *Estoppel—Unauthorized improvement—Acquiescence.*

There can be no estoppel to deny the validity of an assessment to pay for a local improvement if the improvement was made without the consent of a majority in value of property owners in the district to be affected; but if the law were otherwise, the failure of property owners who have seen an unauthorized improvement made to take active steps to prevent it would not estop them from contesting the validity of an assessment to pay therefor where they, by a written protest, notified the board of improvement, before the improvement was begun, that they would resist the payment of all assessments therefor.

Appeal from Pulaski Chancery Court.

DAVID W. CARROLL, Chancellor.

*Sanders & Cockrill* and *P. C. Dooley* for appellants.

1. This suit was brought under sec. 3731, Mansf. Dig., to restrain an illegal and unauthorized assessment. The statutes were complied with up to and including the passage of the ordinance levying a tax of one per cent. on a basis of cost of $750. Thereafter the statute was wholly disregarded, and all their acts are void.

2. There was no petition for a *macadam* improvement; it was not authorized by the council; and the council had no power, after the pavement was laid, to levy an assessment to pay for it. The authority was limited to *grade* and *gravel* the street. The petitioners asked for nothing more, and, without their consent *expressed in the statutory method*, the council was *absolutely without power* to confer power on the board to do more. Art. 19, Const.; Mansf. Dig. sec. 828; 49 Ark. 480, 491; 50

*id.* 125; 108 N. Y. 373; 2 Dillon, Mun. Corp. p. 769, 800; Welty on Assessments, p. 295; 35 Cal. 523; 14 N. Y. Sup. 579; 87 Mich. 113; 20 Cal. 96. There was no estimate of cost for a macadam street, and an estimate was a condition precedent to making a contract for a local improvement. Mansf. Dig. secs. 834, 836; 33 Kas. 234, 239; *Ib.* 156, 175; 71 N. Y. 309; 75 Pa. 357; 18 Iowa, 85; 24 Kas. 343; 85 Pa. St. 379; 68 N. Y. 23. There was no legal obligation upon the property owners to pay for this unauthorized improvement, and the assessment is void. Cases *supra.*

3. The doctrine of estoppel has no application because :—

(*a*) The property owners were *not* silent.

(*b*) No one was misled. Concealment or silence after knowledge of the fact *of the want of authority* is the very essence of estoppel in this class of cases. 50 Ark. 130.

(*c*) There was no concealment of any fact, and no misleading appearances. 50 Ark. 130; Welty, Assess. p. 318.

(*d*) Where jurisdiction has not been assumed by the council, no sort of representation can work an estoppel to deny a subsequent effort to assume it. Welty, Assess. secs. 197–8. The seven per cent. assessment is not a re-assessment (Mansf. Dig. secs. 870–2, 868), but an *original* assessment without petition or previous ordinance authorizing the improvement. To warrant it, there should be a petition by a majority, an estimate of cost and an ordinance containing a general designation of the work to be done. What is required by statute, and *each* of the requirements, is mandatory and *jurisdictional.* 119 Ill. 324; Welty on Assessments, pp. 282, 283; 47 Cal. 456; *ib.* 15. Where there is a jurisdictional defect, there can be no estoppel. 134 U. S. 632.

(*e*) Where there is no jurisdiction in the council, it is not incumbent upon the property owners to take any steps to stop the work. Want of jurisdiction makes the whole proceedings void. Dillon, Mun. Corp. p. 800; Welty, Assess. p. 318; *Star* v. *Burlington*, 45 Iowa; 41 N. W. 617–19; 43 *id.* 710; 10 Col. 112–122; 11 Md. 186; 15 *id.* 18; 32 Ill. 192; 56 N. Y. 257; 20 Cal. 96; 117 U. S. 683; 134 *id.* 51; 48 Ark. 251; 50 *id.* 131; 55 Ark. 148; 32 *id.* 31. It is sufficient to show that the assessment is illegal. 27 Oh. St. 536; 24 *id.* 253; 48 Ark. 370, 381; 45 *id.* 471, 475.

*Dan W. Jones* and *McCain* for appellee.

The sections of the digest bearing on this case are secs. 825–6–7–8, 836, 868, etc. Counsel for appellant speak of want of *jurisdiction* in the council. As the council has no judicial power, the analogies which the word "jurisdiction" suggests are misleading. The powers of the council are legislative and ministerial. The power to tax themselves is in the lot owners, and the council is the agency or instrumentality by which it is done. The proceedings are not *in invitum*, as in case of a general levy of taxes. If the city ordinance can give any authority, appellants' case is lost, because the ordinance *is broad* enough to authorize the improvement as made. The language is "grade, roll, gravel, or *otherwise improve.*" These local assessments are purely individual and local affairs, and to be governed by substantially the same rules which apply to the dealings of individuals and their agents with third persons. The commissioners are the agents of the property owners. The lot owners knew of all that was done. It was their duty to act promptly. They cannot stand by, and see their property improved, and receive the benefits, and then refuse to pay. They are estopped. 50 Ark. 131; 55 *id.* 156. Even if the action of the board was unauthorized, it was *infra vires.* 10 Wall. 604; 102 U. S. 420; 98 *id.*

621; Herman on Estoppel, sec. 210; 29 Ind. 329; 34 Ind. 146; 38 Kas. 374; 43 Iowa, 482. This doctrine of estoppel is sustained in 39 Ohio St. 281; 25 N. J. Eq. 295; 48 N. W. 819; 3 Wash. 410; 71 Mich. 249; 72 Cal. 433; 40 N. J. L. 246. After careful examination of the cases cited to sustain appellants' position, we find that not exceeding one case is an authority in their favor (10 Col. 112), and in that case the court say the proceeding was under the police power, and not under the taxing power. Many of them are based upon peculiar statutes, unlike ours. But counsel say they did object and protest. So they did; but, the work being stopped, their objections were heard, and the board honestly thought that *all* objections had been withdrawn. The board really *had the consent* of the lot owners from acquiescence. Married women enjoy no immunity on the score of estoppel in cases of this kind. 39 Oh. St. 281; 2 Herman on Estoppel, secs. 1101–1104.

JOSEPH W. MARTIN, Special J. The bill of complaint in this case was filed by appellants, certain owners of real estate along Louisiana street, in the city of Little Rock, between Tenth and Fourteenth streets, to enjoin the collection of an assessment made by order of the city council to pay for an improvement made on that street. They allege that the assessment is without authority of law, and that their property is not legally bound therefor. The defendants (appellees here) claim that the proceedings under which said assessment was made are in substantial compliance with the law, and that, even if there were irregularities or defects, the appellants are estopped to deny the liability of their property for the same.

What is by law required to be done? Our State constitution, after very carefully guarding and limiting the general powers of taxation of the State and counties, in section 27 of article 19, provides as follows:

"Nothing in this constitution shall be so construed as to prohibit the general assembly from authorizing assessments on real property for local improvements in towns and cities, under such regulations as may be prescribed by law, to be based upon the consent of a majority in value of the property holders owning property adjoining the locality to be affected." The law enacted in pursuance of this constitutional provision provides for the following steps to be taken : *First.* Ten resident owners of real estate in the proposed district shall apply by petition for the formation of an improvement district. *Second.* The city council shall lay off the district. *Third.* A majority in value of the owners of real estate in said district shall present to the council a petition praying that such improvement be made, which petition shall designate the improvement to be undertaken. *Fourth.* The council thereupon appoints the board of improvement of the district. *Fifth.* The board is immediately to form plans and procure estimates of the cost of the "improvements as prayed for in the petition." *Sixth.* The board reports plans and estimates to the city council. *Seventh.* The city council by ordinance shall assess the cost upon the real property in the district, and, if more than one per cent. of the value, shall provide for its payment by annual instalments of one per cent. each year. *Eighth.* The board is to go forward with the work, and may do it by contract, and may borrow money and pledge the assessments for payment. *Ninth.* If first assessment is not sufficient to complete the improvement, may have additional assessment levied by the council as at the first. Mansf. Dig. 826 to 837. The other sections of the act deal mainly with the collection of the tax and the condemnation and sale of real estate thereunder, and are very peremptory and summary in character.

What was done in this case?

*First.* About July 22, 1890, a petition, signed by ten and more resident owners, was presented to the city .council, "to form said part of Louisiana street from 10th to 14th streets into an improvement district, for the pur-· pose of "grading, rolling and graveling it."

*Second.* On July 22, 1890, the council passed an .ordinance creating "Improvement District No. 33," for the purpose of "grading, rolling, graveling or otherwise improving said Louisiana street."

*Third.* About same time a number of the owners ·of real estate in District No. 33, as is recited in the application, presented to the city council a petition in which they pray that Louisiana street within said district be "graded, rolled, shaped, and graveled, and that the cost thereof be assessed and charged upon the real ·property situated within said district." To this petition is attached the certificate of the county clerk, as by the .act provided, showing that the petitioners constitute a majority in value of the owners of real estate in the dis-·trict. Aggregate value as shown $75,475; petitioners property $44,325.

*Fourth.* On August 26, 1890, the board of improve-·ment presented to the city council the following·report: "We, the Board of Commissioners of Grading District No. 33, beg to report that we have organized by the ·election of H. P. Edmonson as chairman, and that we have caused an estimate to be made, which amounts to :$750, which being one per cent. of the assessed valuation, we respectfully ask the passage of the attached ·ordinance," signed by the members of the board.

*Fifth.* On September 22, 1890, the council passed ·Ordinance No. 277, as follows: "An ordinance to .assess the cost of *grading* that part of Louisiana street lying between Tenth and Fourteenth streets, in Grading District No. 33, in the city of Little Rock, upon the :real property of said district. Whereas, a majority of

the property holders owning real property adjoining the locality to be affected and situated in Grading District No. 33, of the city of Little Rock, organized for the purpose of improving the street therein, have petitioned the city council of the city of Little Rock for the construction of such improvement, and that the cost thereof be assessed against the real property in the said district; and whereas the estimated cost of said improvement is seven hundred and fifty dollars ($750), amounting to one (1) per centum of the assessed valuation of the said property; therefore, be it ordained by the city council of the city of Little Rock: Section 1. That all the property situated in the said district be assessed at the rate of one (1) per centum on the dollar of the assessed valuation, as the same appears in the assessment last made by the assessor of this (Pulaski) county, now on file in the county clerk's office, which assessment shall be paid in one annual instalment of one per centum, which shall be paid on or before the 20th day of October, 1890; and when said assessment shall have been paid, if the same shall prove insufficient to complete the said improvement, the board of improvement of the said district shall report the deficiency to the city council for further action as required by law."

This ordinance is inserted in full, as it shows the status of the proceedings up to that time, and which seems to have been all regular and in conformity to law, except as hereinafter noted. And, doubtless, if the work had progressed on the plan adopted and up to that time acted upon by all parties, there would have been no disagreement. But here the trouble began. The board about this time became satisfied that the "graveling" would be more expensive than had been estimated, and that "macadam" would be more desirable, and could be obtained at little, if any, increased expense; and accordingly entered into a contract, of date October 25, 1890,

with the Little Rock Granite Company, for an improve-
ment of stone "guttering, curbing, and macadam," to
cost $5,359.20, instead of the "graded and graveled"
street at $750, as at first estimated and reported to the
council.  And here we take occasion to say that there is
nothing in the record to impeach in the least the integrity,
good faith and conscientious motives of the gentlemen
constituting the board of improvement.  They were res-
ident citizens of prominence in the district, interested in
the improvement, whose property had to bear its pro-
portion of the tax, and who gave their time and labor
gratuitously to the accomplishment of the work.  Under
this contract the work was shortly afterwards begun
by the contractor, and by the 18th of November, 1890,
the greater part of the street along the four blocks
from Tenth to Fourteeenth had been plowed up, par-
tial excavations made, preparatory for the macadam,
and considerable stone had been hauled for the curb-
ing and guttering, and some of the curbing was being
put in place.  At this juncture, many of the property
owners—a majority in value—for the first time, as is
alleged, made aware of changes in the character of
the work proposed by the board, and of its vastly in-
creased expense, prepared and sent to the board, on the
18th of November, a remonstrance as follows :

"Gentlemen:   We, property owners in said dis-
trict, respectfully state that when we petitioned the
city council for the formation of said district, we did so
with the distinct understanding that the improvement
would be grading, rolling and graveling only, at an ex-
pense not to exceed $10 a lot.  We now understand that
the contemplated improvement is stone curbing and gut-
terings and macadam, at an expense of over $100 per
lot, which the value of the property in the district will
not justify without greatly oppressing the owners.  The
contemplated change from gravel to stone, at the price

to be paid, is an entire change from the desire and expectation of the owners who asked for the improvement, and one that they would not have originally asked for or desired. We further think that there is no power, under the ordinances creating the district, to make so radical a change in the sort of improvement to be made against the will of the property owners, and respectfully notify the commissioners, if the work of macadamizing, curbing and guttering with stone is continued, we will resist the levy and payment of all taxes to pay for it, in excess of the stipulated cost of the original improvement specified in our petition to the city council, and now notify the commissioners of our intention, that they may take such a course in the matter as they may deem advisable."

This was signed by owners representing nearly two-thirds in value of the real estate in the district. Upon its presentation to the board, the gravity of the situation was realized, the work was suspended, and a public meeting called by the board at the law office of a member, for consultation with the property owners as to what was best to be done. As to the attendance at this meeting, the value of property represented, and the results attained, the evidence is somewhat conflicting. At all events, the board, deeming itself justified by the expression of sentiment obtained, ordered the work forward, and the contractor continued, and sometime in the early part of April, 1891, without further objection made to the board, it was completed. It appears to have been well done, and to have been a valuable improvement to much, if not all, of the property along the street, and to have been worth the contract price.

In the meantime, along in January and February, 1891, the assessment of one per cent. made by Ordinance No. 277 had been paid in full, and turned over by the board to the contractor. There remaining a balance of

nearly $5000 on the contract, the board, in December, 1891, applied to the city council for an additional assessment of *seven per cent.* to complete the payment. Against this application a very strenuous resistance was made before the council by the property owners, through their attorney; but the board prevailed, and, on the 18th of January, 1892, the following ordinance was passed: "Ordinance No. 393. An ordinance to authorize the Board of Improvement of Grading District No. 33 to collect an additional assessment of seven per cent. upon the real property of said district for the improvement contemplated thereby. Be it ordained by the city council of the city of Little Rock: Section 1. That the real property in said Grading District No. 33 be, and the same is hereby, assessed at the rate of seven per centum on the dollar of the assessed valuation of the real estate within said district, as the same appears by the last assessment made, and existing on the first day of December, 1891, in the assessment rolls of Pulaski county, subject to such later assessments upon the said rolls as may be contemplated by law; which assessment shall be paid in seven annual instalments of one per centum per annum at the same period of the year as has been heretofore adopted by the said board of improvement for the payment of prior assessments therein." This action of the council was taken without any report whatever from the board as to the deficit to be made up, the estimated cost, or change in the character of the work. The collector, defendant Griffith, was proceeding to collect the first annual instalment under this ordinance when the appellants filed their bill in this case.

The first step to be taken by the city council is to lay off the district "designating the boundaries of such district, so that it may be easily distinguished." By reference to the description given in the ordinance creating the district, it will be seen that no boundaries were defined.

It is as follows: "On Louisiana street, between the following points, that is to say, on Louisiana street, from a straight line drawn at right angles with the center line of Louisiana street along the center line of Fourteenth street, to a straight line drawn at right angles across the center line of Louisiana street, along the center line of Tenth street, be and the same is hereby laid off," etc. "On Louisiana street" means nothing. It is for the council to determine how far back on either side of the street real estate is "adjoining the locality to be affected." And in *Little Rock* v. *Katzenstein*, 52 Ark. 112, the court say: "Except when attacked for fraud or demonstrable mistake," the finding is conclusive. Neither the act or the decisions of our court in any way relieve the difficulty. Whether district No. 33 extends out one foot or three hundred feet from the street in no way appears, and, strictly construed, the district is nothing but a straight line down Louisiana street. But as all parties have treated it as extending to the center of the blocks on either side, as is usual, we only advert to it here in passing.

The next and all-important step is the petition of "a majority in value of the owners" for the improvement, for which not only their property, but that of all other owners in the district, shall be taxed, even those who are unwilling to be burdened for any kind of improvement; for we must bear in mind the very object is, by means of the law, to force their neighbors into what the petitioners are willing to help pay for. This petition is "to designate the nature of the improvement to be made." No owner is expected to sign unless he is willing that his property shall be assessed to pay for the improvement named, nor does he in any way bind his property for any other improvement than that for which he prays. There is little room for discussion or controversy as to whether such a provision as this is

*1. Assessments for local improvements.*

merely directory or is mandatory. It is based on the fundamental provision of the constitution allowing the general assembly to confer such power on any municipal corporation, and is carefully preserved by the express language of the act. That such a provision is mandatory, and a condition precedent to the exercise of the power by the city, its officers and agents, is settled law. Such attempted exercise is strictly scrutinized by the courts, and any substantial departure from the mandatory provisions of the statute granting the power will render the act utterly nugatory and void; and of this rule all persons invoking the power, or claiming under it, must, at their peril, take notice.

"Statutes which impose burdens or liabilities unknown at common law are construed strictly in favor of those upon whom such burdens are imposed." "Mandatory statutes are imperative; they must be strictly pursued." "When a statute is passed authorizing a proceeding which was not allowed by the general law before, and directing the mode in which an act must be done, the mode pointed out must be strictly pursued. It is the condition on which alone a party can entitle himself to the benefit of the statute that its directions shall be strictly complied with. Otherwise the steps taken will be void." Sutherland on Statutory Construction, secs. 390 and 454; Endlich on Interpretation of Statutes, secs. 345, 352 and 434; Beach on Public Corporations, secs. 1166 and 1177; Cooley on Taxation, p. 283; Welty, Law of Assessment, sec. 221.

Says Judge Dillon, one of the ablest and clearest law writers in the books: "As the authority to make local assessments does not exist unless legislatively conferred, so it can be exercised no further than it is clearly given, and if the *mode* in which the authority shall be exercised is prescribed, that mode must be pursued." 2 Dillon, Mun. Corp. sec. 769. And, further, he says: "Where

the power to improve depends upon the assent or petition of a given number or proportion of the proprietors to be affected, this fact is *jurisdictional*, and the finding of the city authorities or council that the requisite number had assented or petitioned is not, in the absence of legislative provision to that effect, conclusive. The want of such assent makes the whole proceeding *void*, and the non-assent may be shown as a defense to an action to collect the assessment." 2 Dillon, Mun. Corp. sec. 800.

"Where a petition of a certain number or proportion of the owners of property is necessary to set the machinery of the statute authorizing the improvement in motion, a petition meeting all the requirements is an indispensable prerequisite to the jurisdiction of the municipal authorities." Beach on Pub. Corp. sec. 1180; *Zeigler* v. *Hopkins*, 117 U. S. 683.

"A statute delegating authority to charge property with the expense of local improvements must be strictly pursued. What the legislature has prescribed must be done, and cannot be declared to be merely directory and immaterial." *Merritt v. Port Chester*, 71 N. Y. 309; *Matter of Pennie*, 108 N. Y. 373.

"The duties and powers of officers of a public corporation or its agents are prescribed by statute or charter, which all persons not only may know, but are bound to know." 1 Dillon, Mun. Corp. sec. 457.

In *State v. Railway*, 31 Ark. 720, this court say: "Judge Dillon, in his work on Corporations, paragraph 419, says: 'Where the authority to act is solely conferred by statute, which is, in effect, the letter of attorney of the officer, all persons must, at their peril, see that the act of the agent on which they rely is within the power under which the agent acts.'"

This court, in the recent case of *Newport* v. *Railway Co.* 58 Ark. 275, quoting from *Schumm* v. *Seymour*, 24 N. J. Equity, 144, say: "It is a general and

fundamental principle of law that all persons contract-
ing with a municipal corporation must, at their peril,
inquire into the power of the corporation, or its officers,
to make the contract."

**2. Consent
of majority
necessary.**
    That the consent of a majority of the owners, where
the statute requires it, is jurisdictional, and that the
failure to obtain it is fatal to all proceedings under it,
and renders them null and void, see, in addition to above,
*Keese* v. *Denver*, 10 Col. 122; *Jefferson Co.* v. *Mt. Ver-
non*, 145 Ill. 80; *Mulligan* v. *Smith*, 59 Cal. 206; *Hud-
son* v. *Jefferson Co.* 28 Ark. 360; *Ladd* v. *Spencer*, 31
Pacific R. 474; *Holland* v. *Baltimore*, 11 Md. 186;
*Bouldin* v. *Baltimore*, 15 Md. 18.

    In *Mulligan* v. *Smith*, *supra*, the court, in dismiss-
ing this question of a majority petition which had been
omitted in that case, say: "The presentation of the
petition required by the statute was therefore essential.
It was, as other courts have expressed it, a jurisdictional
fact, that may not be presumed or inferred, upon which
rested all the subsequent proceedings." And further
on: "A common requirement, says Mr. Cooley, is that
the improvement shall be asked for or assented to by a
majority or some portion of those who would be taxed.
The want of compliance with this is fatal in any stage of
the proceedings."

**3. Power of
board to alter
plans.**
    This case is peculiar in the fact that there was a
petition in due form, and signed by a majority of the
owners, for *an improvement*. But the improvement des-
ignated in that petition was to have the street "graded,
rolled, shaped and graveled." The expense of this im-
provement, as duly reported to the council by the board,
was $750. And that is about what the owners alleged
and testified they supposed it would cost, and that they
were willing to pay, and did really pay in the first
assessment collected while the work was progressing.
The improvement for which they are now assessed and

asked to pay is "*stone curbing, guttering and maca-dam*" at an expense of $5,359.20. The first would have been paid off in one assessment; the last, bearing interest at ten per centum per annum, will require many years to liquidate. To hold that such a departure from the original petition can be sustained would be to strip the property owners of all possible protection, so carefully provided for them, both in the constitution and the statute. The approval of such a proceeding would necessarily put a quietus on all effort at anything less than the most expensive improvement tolerated by the statute, when there would be no danger from this indefinite expansion. For if a petition for a "*graded and graveled* street," at $750, can be stretched to cover a *stone curb and macadam* improvement, costing over $5000, then a property owner could hardly dare ask for a dirt road street past his house, lest he should, in the marvelous evolution of the power conferred in his simple petition, find his home burdened with the cost of a most extravagant granite pavement, erected by his more energetic and progressive neighbors.

That there was a radical change made here is obvious at a glance. Dr. Stark, one of the board, who had actively participated in the original movement for the "*graded and graveled*" street, very frankly told the other members that he could not consistently vote for the "change." He knew that was not what the owners signing the petition wanted or expected or *asked for* in their petition. The engineer refers to it as a change to "macadam" from "grading and graveling." Indeed, throughout it was recognized by all parties as such a change, but one which the board thought desirable, and they, doubtless in perfect good faith, entered upon the last improvement, thinking it for the advantage of the property owners, whom they claimed to represent as their agents in doing the work. And, in a certain very

limited sense, where the law has been complied with, they may be regarded as their agents. But it must be borne in mind always that the terms of such *quasi* agency are rigidly prescribed by the law of their creation, and that law is the measure of their power beyond which they cannot go. The petition prescribed the extent of their power, and everything beyond that was without authority of law, and void. The assent of the owners for this improvement was never obtained, no petition was ever made for it, and no power ever given to the board to make it.

### Estoppel by Acquiescence.

4. Estoppel
by acqui-
escence.

There is much plausibility in the argument that the owners of property, having seen the improvement made, and enjoying its benefits, without active steps to prevent it, are now estopped by their acquiescence. If the defects were mere irregularities in the exercise of a power conferred, this contention, in a proper case, might be maintained. But this rule has no application in a case like the present, where there is an absolute failure on the part of the board to secure the power to act through the essential prerequisite—the petition of the property owners for the improvement to be made.

The court say, in *Starr* v. *Burlington*, 45 Iowa, 90: "As the proceedings for the assessment upon plaintiff's property are void—were without jurisdiction from the beginning, he is not estopped to deny their validity on the ground that he made no objection while the improvement was in progress. As to mere irregularities, he would be estopped." In *Keese* v. *Denver*, 10 Col. 122: "The objection goes to the power, and is jurisdictional. The principles of estoppel have no application to the facts in this case." And in same case: "The consent of the majority of property owners is jurisdictional." In *Chicago* v. *Wright*, 32 Ill. 193: "As the objection goes

to the origin of the proceedings, the parties are not estopped to object because they failed to object in time before the council, as they might have done." And in a recent case (*Newport* v. *Railway Co.* 58 Ark. 275), this court states the rule to be thus: "The doctrine of equitable estoppel has no place in a case where usurped powers have been exercised by the officers." On this point see, also, *Tone* v. *Columbus*, 39 Ohio St. 299; *Motz* v. *Detroit*, 18 Mich. 495; *Zottman* v. *City of San Francisco*, 20 Cal. 98; *Kankakee* v. *Potter*, 119 Ill. 324; *Coggeshall* v. *Des Moines*, 41 N. W. 617; *McLauren* v. *Grand Forks*, 43 N. W. 710; *Matter of Sharp*, 56 N. Y. 259. In *Mulligan* v. *Smith*, 59 Cal. 233, the rule is thus forcibly stated: "Nor does the failure of the defendant to resort to legal remedies against the proceedings while *in fieri* constitute an equitable estoppel. It was the duty of those who were authorized to exercise powers which might bind the real property of defendant to see that the provisions of the statute under which they acted were complied with."

But independent of this proposition of law, which precludes the defense of equitable estoppel in this case, we think the facts, fairly considered, furnished no grounds of estoppel. The appellants were not silent. On the other hand, as soon as they learned of the illegal action of the board in entering upon the changed work, they at once filed with them their earnest remonstrance, and advised the board and the contractor that they would not be bound by it, and would resist any assessment to pay for it. It will hardly be contended that the public meeting called by the board would have any material effect to validate the proceedings. The statute under which the board was acting has no place in it for procuring the assent of a majority of property owners by the vote of a mass meeting. If the board was proceeding, as we have seen, without legal author-

ity or power, an appeal to such source was a vain and futile thing to do. Indeed, most of the property owners in the supposed district, in their depositions, either deny attending the meeting, or assert they did nothing there to assent to the change in the work. The "remonstrance" put the board and all persons dealing with it upon full notice that the property owners proposed to stand squarely on their legal rights. That they did not afterwards make further objection to the effort to impose the additional seven per cent. assessment was consistent with their attitude of declared opposition. They could not prevent the progress of the work upon the public streets. They had made their protest in distinct and definite terms, and could only await developments. And when the time came, as indicated in their protest, they are found making very earnest and continued opposition, all along the line, to the imposition of any assessment beyond the one per cent., which had been, as conceded, legally made under Ordinance 277; and its payment furnished no ground for equitable estoppel as to the seven per cent. assessment, which all parties had express notice they would resist.

The power of taxation, especially for local improvements, is the highest attribute of sovereignty. It involves the right to take the private property of the citizen without his consent, and without any other consideration than that of the public good. Such statutes must be construed with the greatest strictness, and he who would, by these proceedings, force his unwilling and perhaps more prudent neighbor into such an enterprise must see to it that he strictly complies with all the substantial requirements of the law which he invokes. In *Matter of Sharp*, 56 N. Y. 259, the court very fairly presents the great and mischievous consequences which result from an attempt to apply too freely the doctrine of equitable estoppel in making public improvements, where some are

made to pay and some are released, according to the atti-
tude of each individual, and take the ground, which
seems based on wise considerations of public policy, that
the proceedings ought to be such that "all are barred or
none." While we will not say that this rule is one of
universal application, yet there is no question but that
the public interests and the protection of private prop-
erty rights alike imperatively demand that the utmost
vigilance and caution be exercised in the use of a power
so dangerous in its abuse.

In this case, when the board found it impracticable
to make the improvement the property owners had peti-
tioned for, there was but one course for it to pursue—
stop the work, and go back to the beginning, and get a
petition signed by the necessary majority for this new
work. Failing to do this, omitting to get the legally
expressed assent of a majority in value of property own-
ers for this new improvement, from that time forward
the board and the city council were absolutley without
power to act; and the ordinance to assess the seven per
cent. tax and all proceedings under it were and are null
and void.

The decree of the court below is accordingly re-
versed, and the appellees are perpetually enjoined from
any further proceedings under said Ordinance No. 393,
or to charge the real estate of appellants with the costs
of said improvement.

Judge Battle disqualified. Judge Riddick, who was
not present at the submission, did not participate in the
opinion and judgment.