## CURB AND GUTTER DIST. NO. 37 OF CITY OF FAYETTEVILLE, ARK., et al v. PARRISH.

### No. 11544.

Circuit Court of Appeals, Eighth Circuit.
April 2, 1940.

Rehearing Denied April 22, 1940.

Clifton Wade and O. E. Williams, both of Fayetteville, Ark., for appellants.

Henry L. Fitzhugh, of Fort Smith, Ark. (Charles D. Atkinson, of Fayetteville, Ark., and Wallace Townsend, of Little Rock, Ark., on the brief), for appellee.

Before WOODROUGH and THOMAS, Circuit Judges, and NORDBYE, District Judge.

NORDBYE, District Judge.

This appeal involves the validity of two companion municipal improvement districts of the City of Fayetteville, Arkansas—Paving District No. 36 and Curb and Gutter District No. 37—and the right of the trustee to maintain the suits in the United States District Court and to obtain judgment against the District on the bonds. The parties will be referred to as below. It was stipulated that the disposition of the issues on this appeal would control the determination of the companion case, Paving District No. 36.

The District contends that the court erred in overruling its motion to dismiss the trustee's bill of complaint as amended for the reasons that (1) (a) the trustee is a mere nominal party suing in a representative capacity and that the citizenship of the bondholders, and not of the trustee, determines the question of diversity, and (b) that the appointment of the plaintiff as substitute trustee was a fraudulent scheme and fictitious arrangement for the purpose of creating a spurious ground for federal jurisdic-

tion; (2) that the court erred in refusing to sustain the District's plea of res judicata; (3) that the bonds were invalid because of a jurisdictional defect, in that there was an insufficient number of property holders as signers to the petition for the creation of the District; and (4) that the court erred in holding that the assessors of said District made and filed assessments of benefits therein.

This proceeding involves the validity of $21,500 five per cent bonds, issued by the District to improve the streets of the City of Fayetteville, Arkansas. The execution and sale of the bonds are admitted. Further, it is not controverted that the District has received the funds for which the bonds were sold and that the money has been used for the improvements contemplated. The bonds in suit were issued pursuant to procedure which was regulated by the Arkansas statutes. On June 6, 1927, a petition signed by seventeen purported property owners requested the formation of the District. An ordinance of the City of Fayetteville stating the boundaries and the purpose of the District was passed by the City Council and thereafter published in a local newspaper. On or about June 13, 1927, a second petition was filed by the same property owners. The abstracter's certificate which was filed in connection with this petition showed the total assessed value of all property in the District and the value of the property owned by the signers to the petition. Notice was thereafter given of the filing of the second petition by publication, and on July 11, 1927, at a hearing before the City Council, the said Council determined that the signers of the petition constituted a majority in value of the owners of the property within said District and appointed three persons as a Board of Improvement for said District. No suit was brought in Chancery Court of Washington County, Arkansas, within the thirty days' limitation for review of the action of the City Council. Section 5652, Crawford and Moses' Digest, Statutes of Arkansas. The Board of Improvement, according to the records, took oath of office as required by the statute and the same was filed with the City Clerk. Estimate of costs was procured, assessors were appointed, and assessments of benefits were apparently returned and filed. In April, 1928, the City Council passed an ordinance assessing benefits and published the same as required by statute. Thereafter, the Commissioners of the District issued a series of bonds aggregating.

$21,500, with interest at five per cent per annum, maturing serially on November 1st of the years 1928 to 1937, both inclusive. These bonds were secured by a pledge or mortgage pledging the future credit, assessed benefits, and other resources of the District. The American Southern Trust Company of Little Rock was named trustee, and the pledge was duly filed in the office of the Circuit Clerk.

The District offered the bonds to M. W. Elkins & Company, of Little Rock, which, prior to the purchase, submitted a duly certified transcript of the proceedings before the City Council and the Commissioners to its counsel, an experienced firm of bond attorneys, who rendered an opinion approving the bonds, and thereafter Elkins & Company paid the full amount of the purchase price, which was not less than that allowed by law. The bonds were thereafter sold to the public before maturity in the due course of business and the purchasers of said bonds are bona fide holders for value. It appears that the bonds are in the usual form and on the face contain the following covenant: " * * * The said Curb and Gutter District Number 37 hereby covenants that the said district has been duly organized in accordance with Section 5647 to 5743 of Crawford & Moses' Digest of the Statutes of the State of Arkansas, and the acts amendatory thereof, under ordinances duly passed by the City Council of the said City of Fayetteville for that purpose; that the real property in said district has been duly assessed as required by law for the making of the improvement aforesaid, that said assessment of benefits has been duly pledged for the security of this bond; and that all conditions and things required to be done precedent to and in the issuing of this bond have been done, have happened and have been performed as required by law."

The court found that the Commissioners and the property owners knew of the creation of the District and the objects and purposes thereof; that they knew of the sale of the bonds and that the proceeds of the sale were used to defray the expenses in connection with the improvements. No person questioned the validity of the District, or of the bonds, until long after the improvements were made. Some $7,083 had been collected on the assessments and applied on the bonds prior to any attack on the validity of the proceedings.

On July 12, 1931, after default in the payment of the bonds, an action was commenced in the Washington County Chancery Court in the name of the Commissioners of said District against the owners of delinquent land in said District for the purpose of collecting assessments alleged to be due on said lands. One E. M. Ratliff was one of the Commissioners and also one of the land owners. An answer was interposed denying the existence of a legal District and alleging other irregularities. This action lay dormant until 1934. The attorney who had instituted the suit on behalf of the Commissioners withdrew before trial in that the District apparently had no funds with which to pay him, and a Mr. Townsend and a Mr. Atkinson thereafter assumed the representation of the Commissioners in that proceeding. On October 19, 1934, a decree was rendered in Chancery Court sustaining the position of the property owners. The court held that the bonds were invalid because the original petition of the property owners had an insufficient number of qualified signers, and that no assessment of benefits had been made or filed. It determined that the assessment was void. No appeal was perfected from this decree.

It was on November 15, 1930, that the American Southern Trust Company, the trustee, became insolvent. No successor trustee was appointed until March, 1936, when H. E. Parrish, an officer of the Citizens National Bank, Fort Scott, Kansas, which bank owned a bond of the District, was appointed. Parrish did not participate in the state court litigation, and in December, 1936, as trustee, he instituted the present action on the bonds and for mandamus to enforce their payment. This proceeding was commenced in the United States court. The District defended, contending that the jurisdiction of the federal court was fraudulently invoked; that the Chancery Court decree was res judicata; that an insufficient number of property owners had signed the original petition; and that the assessors never filed an assessment of benefits. The trial court determined all these issues in favor of the bondholders, and this appeal followed.

The amount in controversy exceeds $3,000, and the trustee and the District are of diverse citizenship. That the citizenship of the trustee, and not of the bondholders, is determinative of diversity seems free from doubt. The plaintiff, a citizen of Kansas, was appointed in the place and stead of the original trustee, which had become incapacitated by reason of insolvency. The appointment of the successor trustee was prop-

erly made and recorded, all in accordance with the provisions of the pledge. No lengthy discussion is necessary to demonstrate that this is an active trust and not a dry or passive one; that is, the trustee is clothed with certain definite and exclusive powers, such as the right to bring mandamus proceedings and to require the levying of the assessment of benefits. It is his duty to enforce the bond obligation due the bondholders and to bring suit for such purpose. The pledge, in reciting the duties of the trustee, contains the following:

"Said district further agrees that if default is made in the payment of any bond or coupon, the said trustee may declare the entire debt or any part thereof due and shall do so on request of a majority in amount of the holders of the bonds secured by this pledge and may institute in any court having chancery jurisdiction, a proceeding for the foreclosure of this pledge, and in such proceeding it is agreed that such court shall, at the request of said trustee, appoint a receiver to collect all of said assessments and all assessments that may hereafter be levied by said council of said city.

" * * * The said trustee may, in the name of said Board of Improvement, proceed by mandamus, or in any other manner that it thinks best, to compel the levying of such assessments as may be required to pay all of said bonds with interest and expenses."

Rule 17(a) of the Federal Rules of Procedure, 28 U.S.C.A. following section 723c, provides that a "trustee of an express trust * * * may sue in his own name without joining with him the party for whose benefit the action is brought." All authorities recognize that where we have an active trust the citizenship of the trustee controls. Mathis v. Hemingway, 8 Cir., 24 F.2d 951; Dodge et al. v. Tulleys et al., 144 U.S. 451, 455, 12 S.Ct. 728, 36 L.Ed. 501. See, Simkins Federal Practice, Third Edition, Section 88. It follows that this Court has jurisdiction by reason of diversity of citizenship and the statutory amount being involved, unless federal jurisdiction was fraudulently or collusively obtained. Title 28 U.S.C.A. § 80, provides: "If in any suit commenced in a district court, or removed from a State court to a district court of the United States, it shall appear to the satisfaction of the said district court, at any time after such suit has been brought or removed thereto, * * * that the parties to said suit have been improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable under this chapter, the said district court shall proceed no further therein, but shall dismiss the suit or remand it to the court from which it was removed, as justice may require * * *."

■■ The original trustee, by reason of insolvency, could not perform the duties of trustee. See, Pouncey v. Fidelity National Bank & Trust Company, 8 Cir., 85 F.2d 486. It was no longer capable of acting as a representative of the bondholders, and a successor trustee had to be appointed. The bondholders were clothed under the pledge with the absolute right to appoint a successor trustee under such circumstances, and the duty of the court to give full effect to the contract rights of the bondholders is clearly pointed out in Guardian Savings & Trust Co., Trustee, v. Road Improvement District, 267 U.S. 1, 45 S.Ct. 201, 69 L.Ed. 487. They were not responsible for the incapacity of the original trustee, and it is not contended that there was any collusion in that regard. Nor was the original trustee displaced for the purposes of this suit. An examination of the pledge agreement reflects no limitation or restrictions upon the bondholders' right to appoint a successor trustee under such circumstances. Undoubtedly, they could appoint a resident or non-resident person to act in that capacity. But it is urged that a non-resident trustee was selected in order to effect diversity of citizenship, and thus invoke the jurisdiction of this Court and circumvent the decree of the Washington Chancery Court, which had already been rendered.

■ It is conceded that the bondholders deemed it advisable to appoint a non-resident trustee so that suit could be lodged in this Court. When the trustee was examined, he frankly admitted that he was informed by the attorney for the bondholders that he was being selected so that diversity of citizenship would exist in the contemplated action against the District. However, under the circumstances herein, the motive which may have actuated or induced the bondholders to select a non-resident trustee is immaterial. The appointment and qualification of the plaintiff trustee was real and bona fide. It was not merely colorable or feigned. No wrongful act was perpetrated in invoking the jurisdiction of this Court. In other words, the bondholders simply did that which was lawful and no fraud can be perpetrated thereon. It is

not wrongful for parties to prefer to litigate the subject matter of a controversy in federal court if no improper act is done in furtherance thereof. In Bullard v. Cisco, 290 U.S. 179, 54 S.Ct. 177, 78 L.Ed. 254, 93 A.L.R. 141, the Supreme Court considered the right of transferees of corporate bonds and coupons payable to bearer to sue in federal court where it appeared that the transferrers were disabled from proceeding in that court. The transferees consisted of four non-resident persons named as a bondholders' committee. The court held that the arrangement created an express trust with the transferees as trustees and the transferrers as beneficiaries. It was held that, under Section 41(1), Title 28 U.S.C., 28 U.S.C.A. § 41(1), the citizenship of the trustees controlled, and in sustaining the jurisdiction of the federal court, we find the following statement (290 U.S. at page 188, 54 S.Ct. at page 180, 78 L.Ed. 254, 93 A.L.R. 141): " * * * With one accord prior decisions of this Court show that the right of a transferee of corporate bonds and coupons, payable to bearer, to sue in a federal court, notwithstanding a disability of his transferrers in that regard, turns on the nature of the transfer—whether it be real or only a colorable device to enable the transferrers, through the favor and name of the transferee, to invoke a federal jurisdiction which they could not invoke in their own right." See, also, Royal Oak Drain District v. Keefe, 6 Cir., 87 F.2d 786.

So it is immaterial that the object of a plaintiff, for instance, in joining a resident defendant, is to defeat a removal to federal court if by state law there is joint liability. In Mecom v. Fitzsimmons Co., 284 U.S. 183, at page 189, 52 S.Ct. 84, at page 87, 76 L.Ed. 233, 77 A.L.R. 904, in an action brought by an administrator, the court stated:

" * * * It is nevertheless insisted that, if the petitioner's appointment was accomplished for the purpose of avoiding diversity of citizenship and consequent removal into the United States court, the parties to that proceeding—the petitioner, the widow, and her attorney—were in a conspiracy to defeat federal jurisdiction.

"But it is clear that the motive or purpose that actuated any or all of these parties in procuring a lawful and valid appointment is immaterial upon the question of identity or diversity of citizenship. * * * It has been uniformly held that, where there is a prima facie joint liability,

averment and proof that resident and non-resident tort-feasors are jointly sued for the purpose of preventing removal does not amount to an allegation that the joinder was fraudulent, and will not justify a removal from the state court. Illinois Central R. Co. v. Sheegog, 215 U.S. 308, 30 S.Ct. 101, 54 L.Ed. 208; Chicago, B. & Q. R. Co. v. Willard, 220 U.S. 413, 31 S.Ct. 460, 55 L.Ed. 521; Chicago, R. I. & P. R. Co. v. Schwyhart, 227 U.S. 184, 33 S.Ct. 250, 57 L.Ed. 473."

■ Thus, where a sale is real and absolute—not merely colorable—and the grantee brings suit in federal court, the court will not, in passing upon the question of federal jurisdiction, inquire into the motives of the parties in making the transfer. Board of Education v. James, 10 Cir., 49 F.2d 91. Nor is cooperation between the parties in bringing a case in the United States courts necessarily objectionable. "There is nothing unlawful or contemptuous in co-operation in submitting genuine private difficulties to the arbitrament of a federal court." May Hosiery Mills v. United States District Court, 9 Cir., 64 F.2d 450, 454. Even where residence has been changed for the purpose of effecting federal jurisdiction, the right to proceed in federal court is not affected if the change of residence has been actual and bona fide. Shoaf v. Fitzpatrick, 6 Cir., 104 F.2d 290. The contention that the institution of the suit in federal court was prompted by an intention to defeat fraudulently the chancery decree, is too vulnerable to merit any discussion. This Court, as well as any state court that might obtain jurisdiction of an action in behalf of the bondholders against the District, is governed by the same law and facts as to whether the decree is res judicata. Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. The identical question would be before either court.

■■ Nor is there any showing of collusion. Bouvier defines collusion as "an agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law." 1 Bouv.Law Dict., Rawle's Third Revision, p. 526. It is generally recognized that collusion in law embraces either a fictitious or assumed state of facts in order to obtain a judicial determination, or an actual existence of issues which have been corruptly arranged beforehand in order to obtain the court's determination. The Supreme Court stated in Dickerman v. Northern

Trust Co., 176 U.S. 181, 190, 20 S.Ct. 311, 314, 44 L.Ed. 423, that collusion "implies the existence of fraud of some kind, the employment of fraudulent means or of lawful means for the accomplishment of an unlawful purpose." Here, we have a suit between the real parties in interest on bona fide issues, which by reason of diversity are cognizable in this Court. "So long as no improper act was done by which the jurisdiction of the Federal court attached, the motive for bringing the suit there is unimportant." In re Metropolitan Railway Receivership, 208 U.S. 90, 111, 28 S.Ct. 219, 225, 52 L.Ed. 403.

The decree of the Washington Chancery Court of Arkansas was rendered on October 19, 1934. The parties to that suit were the Commissioners of the District as plaintiffs, and the owners of the delinquent lands as defendants. No bondholder was a party. It is earnestly contended, however, that the attorneys Townsend and Atkinson, while ostensibly representing the Commissioners in the chancery suit, were in fact acting for the bondholders and that the decree is res judicata here. It does appear that Mr. Townsend, one of the attorneys for the trustee in the present proceeding, interested himself in the chancery suit and procured Mr. Atkinson to assist him; that Elkins & Company, the bond brokers, retained Mr. Townsend to assist in the prosecution of that proceeding. It further appears that, after the adverse decree in Chancery Court, Mr. Townsend advised the bondholders to appoint Mr. Parrish as trustee and commence an action in federal court. Townsend, however, testified that he represented no bondholder when he assisted at the trial of the chancery suit; that Elkins & Company owned no bonds at that time and that no bondholders had retained him; that the only interest Elkins & Company had in the state proceeding was to maintain, if possible, the standing of its bond house, in that it feared adverse criticism if the bonds were held invalid. There was introduced in evidence a letter written by Mr. Townsend which might be held to be an admission that he did represent one or more bondholders in the state court proceeding. But at the trial hereof, he explained this letter by testifying that his reference to bondholders as his clients referred to Elkins & Company. He further testified that the first time any bondholder consulted him about the matter was after the decree in Chancery Court. Both Townsend and Atkinson testified that, not only did they not represent any bond-

holders, but that they did not even know a bondholder until after the decree had been filed in the state court. The court herein made findings that the bondholders were not bound by the chancery suit. Its finding thereon reads: "XXXIII. That neither the plaintiff nor the holders of the bonds of the defendant district were parties to the suit filed in Washington Chancery Court by the defendant district for the purpose of foreclosing the lien of its assessed benefits against delinquent lands in the district, and that C. D. Atkinson and Wallace Townsend did not represent the plaintiff or the bondholders in that suit."

██ The issue of the participation of the bondholders in state court was upon conflicting testimony. Considerable oral evidence was considered by the court. The testimony denying participation of the bondholders in the state suit was substantial, and this Court should not reverse the determination which rests upon an issue of fact. It is recognized that the Commissioners under the circumstances of the state court suit do not, and did not, represent the bondholders. Road Improvement District No. 1 v. Delinquent Lands, 158 Ark. 58, 249 S.W. 367; Road Improvement District No. 7 v. Guardian Savings & Trust Co., 8 Cir., 8 F.2d 932. The only way in which the bondholders could be bound by that decree would be through Townsend and Atkinson as their representatives. No bondholder was a party otherwise. It follows, therefore, that if the bondholders are not privy to the parties in the action or bound by actual participation in their own interest, the decree of the Chancery Court was not res judicata against them. The court having made a finding that Townsend and Atkinson did not represent the bondholders and there being substantial evidence to support this finding, we should not disturb it.

██ The applicable statutes governing municipal improvement districts in Arkansas at the time that this District was organized was found in Sections 5649 through 5743 of Crawford & Moses' Digest. The District offered evidence to support its contention that the statutory number of property owners did not sign the first petition. It contends that, of the seventeen purported signers, not more than nine property owners signed the original petition, when the law requires ten. Further, that at least one of the nine signers, to wit, School District No. 1, was not an owner of record at the time the petition was filed. Evidence was also

offered to the effect that one M. S. Powers, a purported signer, had not affixed his signature to the petition, but that his signature was merely simulated. The necessity for ten qualified signers of the first petition is jurisdictional, and, according to the Arkansas decisions, if the original petition failed to obtain ten qualified property owners as signers, the entire proceedings are void. Board of Improvement District No. 60 v. Cotter, 71 Ark. 556, 76 S.W. 552. But the evidence regarding the number of signers was conflicting, and there was substantial evidence that ten property owners did sign the original petition. The trial court found: "IV. * * * That said first petition was filed with the city clerk of the City of Fayetteville on the 6th day of June, 1927, and is signed by seventeen persons, and the court finds that ten or more of such signers were owners of real property within the limits of said improvement district at the time petition for said district was filed with the city clerk."

We cannot say that this finding is clearly against the weight of the evidence. Some of the testimony upon which the defendant District relies was given from memory as to events ten years before. It is fair to assume that the court found that much of defendants' testimony, in view of all the circumstances, was not overly convincing. In passing, it may be noted that, while the Washington County Chancery Court found that there were but nine signers to the original petition, defendants' own testimony in this proceeding accounted for two property owners who had signed the petition and who were not included in the names listed by the Chancery Court. Defendants produced an abstracter who certified that, of the seventeen purported signers, seven were not property owners. His testimony, however, would indicate that there were ten bona fide signers. The original certificate of another abstracter filed in April, 1928, certified that all of the signers were owners of real property within the District at the time the petition was filed. The City Council found and certified that the second petition was signed by the requisite number of property owners, and that the signers constituted a majority in value of the owners of the property within the District. The same purported signatures appear on both petitions. It is recognized that the finding of the City Council in this regard is prima facie correct. Dunbar v. Street Improvement District, 172 Ark. 656,

290 S.W. 372. The same statute requires that the Council shall, in determining whether the signers constitute a majority in value, refer only to the records of deeds in the office of the recorder of the county. No unrecorded instrument shall be considered. No such provision with reference to the method by which owners of property shall be determined is found in the statute governing the initial petition. It would seem that this finding of the City Council bears on the verity of the signatures to the original petition which is challenged herein, and supports the trustee's contention that the signers to the original petition were actual property owners in the District. The burden rests upon the defendant to establish that the organization of the District was bottomed on an initial petition which was not signed by the requisite number of property owners. The presumption of validity has not been overcome, and we are not prepared to hold, in view of all the circumstances, that the court erred in giving greater weight to recitals and covenants in official records than to the evidence given by persons from memory. Tyronza Special School District v. Speer, 8 Cir., 94 F.2d 825.

Similar observations may be made regarding defendants' position that the assessment of benefits was not properly made and filed. The record of the City Council proceedings, certified by the City Clerk, details a complete recital of the steps taken and strongly controverts the contention of the defendant in this regard. The court found: "XII. The City Council of Fayetteville, appointed Geo. N. Cade, G. E. Ripley and M. S. Powers as the Board of Assessment of the benefits to be received by each lot or block or other subdivision of land within said district by reason of the proposed local improvement, and that said assessors, before entering upon the discharge of their duties, took the oath required by statute, and an assessment of benefits was deposited and filed in the office of the City Clerk of Fayetteville, Arkansas."

One of the assessors testified in behalf of the defendants to the effect that the signature on the oath of assessors "resembles my signature, but I didn't sign it." However, the record in the Washington Chancery Court indicates that this same witness, in testifying regarding his signature on the assessment roll, stated, "I don't have any remembrance of signing it, but that looks like my signature." It is true that he insisted during the trial herein that his signa-

ture on the assessment oath was not genuine, and that he never took the oath of office as an assessor. However, it is evident from a reading of his testimony that his memory regarding the incidents that occurred was most hazy, and frequently in response to questions with reference to important matters that took place during that period, he contented himself by answering, "I don't remember." Another assessor who testified did remember taking the oath of office, but denied signing the assessment roll, or that he participated in making the assessment. The third assessor was dead. The record, however, shows that all the assessors took their statutory oaths on October 3, 1927, before a notary public. The records of the City Council recite the filing of the assessment of benefits on the same date. On October 4, 1927, the notice stating that the assessment was filed with the City Clerk on October 3rd was published in the Fayetteville Democrat. It was on October 17, 1927, that the City Council passed the ordinance assessing benefits in District Number 37. On December 12th, the assessors requested permission, according to the records, to withdraw the assessment roll for the purpose of correcting "errors and description." A revised roll was filed with the City Clerk on January 16, 1928, and notice thereof duly published on January 19th. On April 23, 1928, the City Council passed an ordinance levying the assessment of benefits, the ordinance being published on April 24th. In attacking these proceedings collaterally, the defendants assumed the burden of proof, and we cannot say that the record referred to, which clearly sustains the regularity of all these proceedings, has been overcome by oral testimony. Tyronza Special School District v. Speer, supra, 94 F.2d at page 830.

But if it be conceded that there is question as to the verity of one or more of the signatures which were affixed to the assessment roll, we are convinced from the record herein that the assessment roll was actually on file with the City Clerk during this period. It is clear that the City Council had before it an assessment roll for this District purporting to be signed and filed by the assessors. There is no contention that the City Council was a party to any fraudulent scheme, and it must be assumed that it acted in good faith and enacted into an ordinance an assessment roll which it believed to be bona fide and which was on file. The property owners received notice through publication of the hearing as to the fairness and validity of the assessments which were to be levied on their property. Section 5668 of the Arkansas Statutes, Crawford & Moses' Digest, makes it mandatory for interested persons to review the assessment by bringing an action in Chancery Court within thirty days after the assessment ordinance is published, and, in absence of such review, the action of the City Council is final and conclusive. This section of the statute provides: "Within thirty days after the passage of the ordinance mentioned above [the assessment ordinance], the recorder or city clerk shall publish a copy of it in some newspaper published in such town or city for one time. And all persons who shall fail to begin legal proceedings within thirty days after such publication for the purpose of correcting or invalidating such assessment shall be forever barred and precluded."

That no objection was made to the assessment by direct attack is therefore fatal to the collateral attack that is now being made upon the validity of the assessment roll. The statutory provision of right of review gives to the owner his day in court, and such provision has uniformly been held to be reasonable. Kirst v. Street Improvement District, 86 Ark. 1, 109 S.W. 526; Boles v. Kelley, 90 Ark. 29, 117 S.W. 1073; Lewellyn v. Street Improvement District, 172 Ark. 496, 289 S.W. 470.

The Supreme Court of Arkansas in Webster v. Ferguson, 95 Ark. 575, 579, 130 S.W. 513, 514, in referring to Section 5685, Kirby's Digest of Arkansas, which is the same as Section 5668 of Crawford & Moses' Digest, stated: "The defendants were barred and precluded from attacking the assessments of benefits on the ground the assessors did not take the oath prescribed by law. * * * And the statute provides that all persons who shall fail to begin legal proceedings within 30 days after such publication for the purpose of correcting or invalidating such assessment shall be forever barred and precluded. Kirby's Dig. 5685. So the defendants having failed to begin such proceedings within the time prescribed are barred by this statute from attacking the assessment because the assessors did not take the proper oath; it not being jurisdictional. Stiewel v. Fencing District, 71 Ark. 17, 24, 70 S.W. 308, 71 S.W. 247." See, also, Ingram v. Thames, 150 Ark. 443, 234 S.W. 629; Thomas v. Street Improvement

District, No. 296, 158 Ark. 187, 249 S.W. 590.

In conclusion, we may again emphasize that the bondholders' money has been expended for such improvements and they are holders of bonds in good faith and innocent purchasers for value. The District obtained the money on its certificate that it had been legally organized, and that the real property had been duly assessed as required by law. It covenanted that the assessment of benefits had been pledged as security for the bonds, and that every statutory step necessary to be taken to perfect the District and to validate the bonds had been strictly observed. The statutes under which the District assumed to proceed are valid, and there is no showing that the assessment levied is in any way inequitable. If any fraud was practiced, the bondholders are entirely innocent. The onus must fall on the District. Assuming, as we do, that the court was correct in finding that ten property owners signed the original petition and that this jurisdictional requirement had been complied with, it necessarily follows that any other irregularities complained of cannot now be raised. The City Council obtained jurisdiction by reason of the initial petition. Some three years elapsed before any objection was raised as to the regularity of the proceedings. If the District is to enjoy the improvements made, it must accept the burdens. The position of the District is therefore utterly void of any equity, and it is estopped to attack collaterally the other steps taken in connection with the levying of the assessment upon the property owners who are benefited by the improvements. Road Improvement District v. Delinquent lands, supra; Road Improvement District v. Guardian Savings & Trust Co., supra; Watkins v. Griffith, 59 Ark. 344, 27 S.W. 234; Davis v. White, 171 Ark. 385, 284 S.W. 764; Hitchcock v. Galveston, 96 U.S. 341, 351, 24 L.Ed. 659; City of Bartlesville v. Holm, 40 Okl. 467, 139 P. 273, 9 A.L.R. 627; Moore v. City of Yonkers, 2 Cir., 235 F. 485; Jackson v. Denver, 41 Colo. 362, 92 P. 690. See, also, cases cited under note in 9 A.L.R. 634.

Error is predicated on the court's refusal to receive certain evidence as to the disappearance of the assessment roll from the files of the City Clerk some years after the improvements had been completed. The court held the proffered evidence to be immaterial. In this we concur. If there was any fraudulent conduct in this regard, it

was, as intimated in the defendants' offer of proof, probably perpetrated by one of the promoters who was also one of the Commissioners of the District. The rights of the bondholders cannot be prejudiced thereby. The decree should be, and is, affirmed.